719 A.2d 980

Joseph ANASTASI

v.

MONTGOMERY COUNTY, Maryland.

No. 582, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Oct. 28, 1998.

474

---

William W. Thompson, II (Zwerdling, Paul, Leibig, Kahn, Thompson & Wolly, P.C. on the brief), Washington, DC, for appellant.

Bernadette F. Lamson, Asst. County Atty. (Charles W. Thompson, Jr., County Atty. and Karen L. Federman Henry, Associate County Atty. on the brief), Rockville, for appellee.

Argued before SALMON and WENNER, JJ., and ROBERT F. SWEENEY, Judge (retired), Specially Assigned.

ROBERT F. SWEENEY, Judge (retired), Specially Assigned.

Appellant, Joseph Anastasi, filed a grievance contesting the refusal of the Montgomery County Police Department ("the Department") to promote him from sergeant to lieutenant. The Department, through Chief of Police Carol Mehrling, denied Anastasi's grievance, and he appealed to Montgomery County's Chief Administrative Officer ("CAO"). After a hearing, the CAO also denied Anastasi's grievance, and he filed another appeal to the county's Merit System Protection Board ("Merit Board"). The Merit Board reviewed both the record of the proceedings before the CAO and written arguments submitted by the parties; it then denied Anastasi's grievance, and he filed yet another appeal to the Circuit Court for Montgomery County. After a hearing, the circuit court affirmed the decision of the Merit Board, and Anastasi has now appealed to this Court.[1]

## ISSUES

Anastasi raises six issues, which we rephrase:

I.   Did the promotional procedure used by the Department violate certain dictates of the Montgomery County Charter and the Montgomery County Code?

II.  Did the maintenance by the Department of a file of memos on Anastasi violate his rights under the Law Enforcement Officers' Bill of Rights ("LEOBR")?

---

1.   The appellee in this case is Montgomery County.

III. Did the maintenance of that same file violate Anastasi's rights under Montgomery County Administrative Procedure 4–8?

IV. Did the Department's use of the memos in that file violate Montgomery County Personnel Regulation 23–2?

V. Was the Department entitled to consider an act of dishonesty in its decision not to promote Anastasi?

VI. Did the Department illegally promote Alfred Dooley to lieutenant during the same promotion cycle?

## FACTS

Anastasi is currently a sergeant with the Department. This case involves the failure of the Department to promote Anastasi to lieutenant during a promotional cycle that lasted from 1993 to 1995.

Anastasi applied for the promotion in July 1993. At the time, the promotional process consisted primarily of taking a competitive examination. After the scores were returned, applicants were grouped into two separate categories—one marked "well-qualified" and another marked "qualified"—and then ranked, by score, within their respective categories. When the ranking process was complete, all the names were submitted to the Chief of Police, who then used the list to fill openings for lieutenant when they occurred.

The Chief's decisions on who to promote were to be based on the following guidelines, set forth in a personnel bulletin dated July 16, 1993:

In making promotional decisions the Chief of Police may consider examination results, length of County service, time in rank, and other information pertinent to the candidate's suitability and potential for successful performance in the higher rank. The Chief may also consider for up to a maximum of five years: personnel evaluations, commendations, reprimands, and disciplinary actions. Information may be obtained by a review of personnel files, examination

results, personal interviews or recommendations from the supervisors of those on the eligible list. The selection process must be consistently conducted at each stage of consideration.

The Chief of Police may formally delegate to others authority to review and consider the above listed information and, based on that information, to recommend officers for promotion. Recommending officers must be at least equal in rank to the promotional position. Several individuals may serve as a recommending panel. Panels should include minorities and women when possible.

Using these guidelines as a starting point, the Department devised a promotional procedure known as "rank order with exception." This meant that when openings at the rank of lieutenant occurred, a committee consisting of the Department's one lieutenant colonel and three majors would meet to discuss the highest-ranked candidate on the two lists.[2] If the committee determined that there were no problems with that candidate, it would signal its approval to the Chief of Police, and the Chief would promote that candidate. If, however, the committee determined that there was a problem with that candidate, it would warn the Chief of Police; the Chief would then decide whether to promote that candidate.

The promotional exam taken by Anastasi was administered in the late summer of 1993. The categories were established on September 30, 1993, and "held open" until September 30, 1995. This meant that during that two-year period, the Chief of Police was to pick all new lieutenants from those categories.

---

**2.** The promotional cycle at issue in this case lasted from September 30, 1993 to September 30, 1995. During that time, the Department had two different Chiefs. Clarence Edwards was Chief of Police at the beginning of the cycle, and stayed in that position until December of 1994. When he left, he was replaced by Carol Mehrling, who currently serves as Chief of Police.

During Edwards's tenure, the recommending committee consisted only of the Department's lieutenant colonel and three majors. After Mehrling took over, the committee consisted of the lieutenant colonel, the three majors, and Chief Mehrling herself.

Anastasi scored 96 points out of 100 on the exam, which was good enough to make him the eighth-ranked sergeant in the well-qualified category. Thus, at the time the categories were established, Anastasi was in a good position to receive a promotion.

In the spring of 1994, however, Anastasi's promotional opportunities took a sharp downturn when he improperly attempted to obtain reimbursement for a car wash, and then lied to his supervisors about his actions. The incident arose out of the Department's policy of reimbursing officers for money they pay to wash their official vehicles. Officers obtain such reimbursement by submitting an expense sheet and a receipt from the carwash. Officers may also obtain from the Department official tokens, which are accepted in lieu of payment by certain Montgomery County car wash vendors. If an officer pays by token, he is required to make a note of the transaction in a log book.

On May 24, 1994, Anastasi, who was then working for the Department's Drug Enforcement Unit, had his vehicle washed, and paid by token. As such, he made a notation of the transaction in the log book. Later, however, he submitted an expense sheet to his superior, Lieutenant John King, seeking reimbursement for the same car wash.

King also went to get his vehicle washed on May 24, and also paid by token; and when he signed the log book, he noticed Anastasi's notation. Thus, when he received the reimbursement request, he became suspicious, and questioned Anastasi about it.

Anastasi told King that he had had his car washed twice on May 24. King apparently did not believe Anastasi, and contacted Captain Robert McKenna, the next officer in the chain of command. McKenna talked to Anastasi, who offered the same story he related to King. After his conversation with McKenna, Anastasi wrote a letter to McKenna reiterating his story.

On May 26, 1994, however, Anastasi called both King and McKenna and admitted that he had only had one carwash on

May 24, and that he had lied about the expense sheet that he submitted. Anastasi also requested a transfer to a different assignment. Anastasi explained to both that he had had his cruiser washed several months before without reimbursement, and that he intended the reimbursement claim submitted on May 24, 1994, to cover the expenses of that earlier carwash. After his conversations with King and McKenna, Anastasi wrote a letter to McKenna apologizing for the incident and reiterating the story about the earlier carwash; that letter provides, in relevant part:

Captain McKenna:

Since I probably won't see you until I get back to work on Tuesday at 4:00 p.m., I again wanted to apologize to you & John for submitting the expense sheet and, more importantly, for lying to both you and John.

I have never been a "company man" who did everything by the book but lying to you guys and then compounding matters by continuing to lie over something small (despite the overwhelming evidence you shared with me) is, without a doubt, the *most assinine* [sic] thing I have ever done in my 21 years here. To the best of my knowledge, I have never given anyone reason to question my integrity before. As it now stands, I have *destroyed* it as far as you and John are concerned.

All of that aside, and with full knowledge that you will endorse my request for transfer, I would like to tell you that two months ago (I'm sorry I don't have the exact date with me now but it was around the middle of March) I *truely* [sic] did take a group of kids on a field trip here in the County in my cruiser. They *really* did trash it and I *really* did pay to get it washed but the attendant collected the receipt. Not having that receipt, I did not submit an expense sheet. I did, however, remember that, at least in my mind, I was owed $8.00 . . .

(Emphasis in original).

At the very end of May 1994, Anastasi was transferred from the Drug Enforcement Unit to the Wheaton–Glenmont Dis-

trict. In early June, McKenna phoned his direct supervisor, then-Major Carol Mehrling, to inform her of the carwash incident. Also in early June, King sent a memo to Lieutenant Colonel Ronald Ricucci, the Deputy Chief of Police, informing him of the carwash incident and recommending that Anastasi's "future performance . . . be closely scrutinized."

On July 21, 1994, McKenna sent a memo to Mehrling expressing concern over Anastasi's promotional potential. The memo focuses primarily on the carwash incident, although it also mentions other, unrelated problems; it reads, in full:

Sergeant Anastasi's eligibility for promotion to Lieutenant should be closely scrutinized in my opinion because of his untruthful statements to his immediate supervisor and myself in reference to the previously reported situation where he submitted a falsified voucher for $8.00. Sergeant Anastasi also was very reluctant to minimize the use of overtime where responsive scheduling would cause the investigation to be completed during the regular work day.

I also feel Sergeant Anastasi finds it difficult to make operational decisions and/or have a command of presence when supervising tactical operations.

Lieutenant King's confidential memo, employee evaluations, and supervisory log of Sergeant Anastasi causes me real concern as to his candidacy for a next higher rank.

A few days later, Mehrling sent a memo to Ricucci requesting that then-Chief of Police Clarence Edwards consider denying Anastasi a promotion; Mehrling's memo specifically referred to the memos issued by King and McKenna. The three memos written by Mehrling, McKenna, and King were kept in a file in Edwards's office. Also kept in that file were the two notes written by Anastasi to McKenna. Anastasi was never made aware of the memos contained in that file.

In addition to all of these memos, King issued a separate "Planning and Performance Appraisal" of Anastasi in the aftermath of his transfer to Wheaton–Glenmont. That evaluation was quite critical of Anastasi's performance in a number of areas, including coordination of scheduling and personnel

training, and documentation of the performances of subordinates. Unlike the other memos, Anastasi was made aware of King's "Planning and Performance Appraisal."

As a result of these negative recommendations, Edwards passed over Anastasi for promotion on several occasions. For his part, Anastasi attempted to rehabilitate himself in the eyes of his superior officers. On August 2, 1994, he met with Mehrling to explain the carwash incident, and to offer his apologies. On August 10, 1994, he filed a grievance over King's "Planning and Performance Appraisal."

Edwards ultimately granted Anastasi's grievance, and agreed to destroy King's negative evaluation on the condition that Anastasi improve his performance; Edwards's decision on the grievance provides, in relevant part:

[T]he performance deficiencies identified by Lt. King are critical supervisory responsibilities which must be corrected. I am therefore directing Lt. King to contact grievant's current unit commander to discuss the performance deficiencies identified. The unit commander will discuss the performance deficiencies identified. The unit commander will develop a work plan to monitor grievant's performance in the specific areas identified. If no improvement occurs between now and the end of the evaluation period, November, 1994, the grievant could receive an unacceptable evaluation. If the grievant's performance does improve and his performance is rated as meets or exceeds requirements, the supervisory notes and appraisal of Lt. King will be destroyed.

On November 15, 1994, Anastasi received an evaluation by two of his unit commanders, as required by the Edwards decision on his grievance. Both of those commanders—Lieutenant Anthony McDonald and Captain Edward Clarke—gave Anastasi very high ratings, and concluded that he should be considered for promotion. McDonald's evaluation provided, in relevant part:

I am pleased to report that the Sergeant has performed in an exemplary manner and that I consider him to be the

most proficient supervisor currently in the District and certainly the equal of any supervisor that I have evaluated during the past 6 years. It should be noted that his performance has been very consistent and has not varied as a result of the mentioned work plan. The Sergeant has demonstrated an ability to perform at a level above his current rank, possibly above the rank of lieutenant. The issues raised by Lt. King have not been observed during this 5 month rating period.

I am very impressed with all of Sgt. Anastasi's skills and abilities and I offer my highest recommendation that he receive consideration for advancement based on his performance in the Wheaton Glenmont District.

Clarke's evaluation provided, in relevant part:

After having observed Sergeant Anastasi's performance in several areas, I can unequivocally state he has conducted himself in a most professional manner and has exceeded the performance standards of his position. I strongly believe that Sergeant Anastasi is ready to assume the position of Lieutenant on a full time basis and hope he is afforded that opportunity.

As a result of these evaluations, King's Planning and Performance Appraisal was destroyed, as required by Edwards's decision on Anastasi's grievance. Also as a result of these evaluations, Edwards decided that he would no longer pass over Anastasi for promotion.[3]

Unfortunately for Anastasi, Edwards stepped down as Chief of Police before the occurrence of another opening for lieutenant. Edwards was ultimately replaced by Mehrling, who decided that, as the new Chief of Police, she was not bound by Edwards's decision to consider Anastasi for promotion. Thus, when the next opening occurred (in the early spring of 1995) Mehrling promoted Sergeant Alfred Dooley, who was ranked

---

**3.** Edwards related this decision to Ricucci, who then passed it along to Anastasi. Ricucci related these events in his testimony at the hearing before the CAO.

lower on the well-qualified list than Anastasi. As a result of Dooley's promotion, Anastasi filed the grievance that has resulted in this appeal.

## DISCUSSION

### I. Validity of the Department's Promotional Procedures

Anastasi's initial challenge is to the procedures used by the Department during the relevant promotional cycle to choose candidates for elevation to lieutenant. Specifically, he challenges the guidelines issued in the personnel bulletin of July 16, 1993, which (again) read as follows:

In making promotional decisions the Chief of Police may consider examination results, length of County service, time in rank, and other information pertinent to the candidate's suitability and potential for successful performance in the higher rank. The Chief may also consider for up to a maximum of five years: personnel evaluations, commendations, reprimands, and disciplinary actions. Information may be obtained by a review of personnel files, examination results, personal interviews or recommendations from the supervisors of those on the eligible list. The selection process must be consistently conducted at each stage of consideration.

The Chief of Police may formally delegate to others authority to review and consider the above listed information and, based on that information, to recommend officers for promotion. Recommending officers must be at least equal in rank to the promotional position. Several individuals may serve as a recommending panel. Panels should include minorities and women when possible.

According to Anastasi, these guidelines violate his rights under the Montgomery County Charter and the Montgomery County Code.

Anastasi's argument is based on § 401 of the Montgomery County Charter and §§ 33–5(a) and 33–5(b)(2) and (6) of the Montgomery County Code. Section 401 of the Montgomery County Charter reads, in relevant part:

The council shall prescribe by law a merit system for all officers and employees of the county government ... The merit system shall provide the means to recruit, select, develop, and maintain an effective, non-partisan, and responsive work force with personnel actions based on demonstrated merit and fitness.

Sections 33–5(a) and 33–5(b)(2) and (6) of the Montgomery County Code, in turn, read as follows:

(a) *Statement of legislative intent.* It is the legislative intent of the county council that this article foster excellence in the public service; high individual competence among employees; recognition that respect for the employee as an individual is first required for achieving such excellence and competence; and harmonious and efficient operation within the various components of county government.

(b) *Merit system principles.* The merit system established by this chapter encompasses the following principles:

\* \* \*

(2) The recruitment, selection and advancement of merit system employees shall be on the basis of their relative abilities, knowledge and skills, including the full and open consideration of qualified applicants for initial appointment;

\* \* \*

(6) All applicants to and employees of the county merit system shall be assured fair treatment without regard to political affiliation or other nonmerit factors in all aspects of personnel administration.

According to Anastasi, these provisions afford him the right to a promotional process in which all candidates are considered openly, equally, and according to relevant (*i.e.,* merit-based) criteria, and in which no candidate is able to benefit from favoritism or cronyism. Anastasi argues further that the procedure outlined in the July 16, 1993 personnel bulletin violated his rights to equal, open and rational consideration under the Montgomery County Charter and the Montgomery County Code because it failed to establish any kind of pro-

motional system which safeguarded those rights. Instead, argues Anastasi, the procedure outlined in the personnel bulletin allowed the Chief of Police to exercise discretion in a way that ignored such rights. To support his position, Anastasi cites *Montgomery County v. Anastasi,* 77 Md.App. 126, 549 A.2d 753 (1988) (hereinafter *Anastasi I*)[4], in which this Court held that the provisions of the Montgomery County Charter and the Montgomery County Code cited above mandate promotional procedures which guarantee open, equal, and rational consideration of all candidates. *Id.* at 135–36, 549 A.2d 753.

If, in fact, the Department had simply relied upon the procedures outlined in the July 16, 1993 personnel bulletin, we would be inclined to agree with Anastasi. Those procedures are very similar to the procedure outlined in former Montgomery County Personnel Regulation 5.6, which provided, in relevant part, that when making promotional decisions, the Chief of Police was "free to choose any individual from the highest rating category based on that person's overall rating, character, knowledge, skill, ability and physical fitness for the job as well as possible future advancement."[5] In *Anastasi I,* this Court specifically disapproved of the use of Regulation 5.6 standing alone. We held that in light of the requirements of the Montgomery County Charter and the Montgomery County Code, the Chief of Police, "in considering each of the factors enumerated in [Regulation] 5.6 ... must proceed by some *system* which ensures: fairness; rational, informed decision making; and compliance with the other mandates of both the Charter and Code." *Id.* at 136, 549 A.2d 753 (emphasis in original).

---

4.  In *Anastasi I,* Anastasi and sixteen other members of the Department successfully challenged the procedures used by the Department in an earlier promotional cycle.

5.  In the aftermath of *Anastasi I,* the Montgomery County Personnel Regulations were reorganized. Thus, Regulation 5.6 is now Regulation 6–3. It also was amended, and now simply reads, in relevant part, that an appointing authority "is free to choose any individual from the highest rating category."

The problem with such an argument, however, is that in this case (unlike in *Anastasi I* ), the Department did not simply rely on the general guidelines in the personnel regulations and bulletins.[6] Instead, it actually took an additional step, and formulated a promotional procedure known as "rank order with exception." Under that procedure, when an opening occurred, a committee consisting of the Department's lieutenant colonel and three majors would meet to discuss the highest-ranked candidate on the two lists.[7] If they had no problem with the candidate, he or she would be promoted. If, however, the committee discovered a problem with the candidate, the problem would be brought to the Chief's attention, and he would make the decision whether to promote or pass over that candidate.

In light of the procedure actually used by the Department, the issue here is not whether the procedure outlined in the July 16, 1993 personnel bulletin violated Anastasi's rights under the Montgomery County Charter and the Montgomery County Code. Rather, it is whether the procedure actually used by the Department—the "rank order with exception" procedure—violated Anastasi's rights under the Montgomery County Charter and the Montgomery County Code.

■ We believe that the "rank order with exception" procedure used by the Department complied with the dictates of the

---

**6.** At this point, we should make clear the hierarchy of personnel laws and regulations in Montgomery County.

At the top are the Montgomery County Charter and the Montgomery County Code. Next are the Montgomery County Personnel Regulations, which are passed pursuant to, and read in light of, the Charter and the Code. Next, there are the personnel bulletins, which are apparently meant to supplement the regulations.

In addition to all of these laws and regulations, there is another set, known as Administrative Procedures, which helps govern the personnel system. These regulations, passed pursuant to § 2A–16 of the Montgomery County Code, supplement all of the other applicable sets of laws and regulations. As we shall see below (in § III of this opinion), Administrative Procedures play an important role in the disposition of this case.

**7.** As noted above, after Mehrling became Chief of Police, she also would attend these meetings.

Montgomery County Charter and the Montgomery County Code. The fact that promotions were made primarily by rank order, and the fact that problems with each candidate were discussed and analyzed by a committee of high-ranking officers (rather than just one or two) were sufficient to assure that each candidate was considered equally and according to relevant, rational criteria. In this way, this case differs substantially from *Anastasi I.* There, where the only procedure used by the Department was the one outlined in then-Montgomery County Personnel Regulation 5.6, the promotional process was found by the Merit Board to be casual and unrecorded; and, in the words of this Court, it had the deficiency "of appearing to grant favoritism to those few individuals who were personally familiar with the decision makers . . . ." *Id.* at 135, 549 A.2d 753. It was for that reason that this Court held that simply following the criteria in then-Regulation 5.6 was improper, and that a system which ensured open, equal, and rational consideration of each candidate was required. Here, by contrast, the Department did implement such a system, and did not simply rely on the personnel regulations and the personnel bulletin. Thus, unlike the situation in *Anastasi I,* there was no finding by the Merit Board of a casual, unrecorded process, and there was, in our judgment, no danger of cronyism, favoritism, or any other kind of unequal treatment of candidates.

To conclude, we agree with Anastasi that the procedure outlined in the July 16, 1993 personnel bulletin invited violations of the Montgomery County Charter and the Montgomery County Code. Nevertheless, because the Department developed and adhered to a separate procedure where candidates were promoted, with limited exceptions, according to rank order on the eligible lists, the dictates of the Montgomery County Charter and the Montgomery County Code were adhered to, and Anastasi's rights were not violated.

## II. Alleged Violation of the LEOBR

Again, in the months that followed the carwash incident, two of Anastasi's direct supervisors—King and Mehrling—sent

memos to the Deputy Chief of Police expressing reservations about Anastasi's candidacy for promotion to lieutenant. Also during that time, another of Anastasi's supervisors—McKenna—sent Mehrling a memo which was also quite critical of Anastasi. These memos were kept in a file, separate from Anastasi's personnel file, in then-Chief Edwards's office; and Anastasi was not made aware of the memos.

Because the memos were not revealed to Anastasi at the time he was being considered for promotion, Anastasi argues that his rights under the Law Enforcement Officers' Bill of Rights ("LEOBR") were violated. Specifically, Anastasi alleges a violation of Md.Code (1996 Repl.Vol.), Art. 27, § 728(b)(12)(i), which provides:

> (b) *Procedure to be followed at interrogation or investigation; record; representation by counsel; statute or regulation abridging right to sue; insertion of adverse material into officer's file; chief under investigation; polygraph examination.*—Whenever a law enforcement officer is under investigation or subjected to interrogation by a law enforcement agency, for any reason which could lead to disciplinary action, demotion or dismissal, the investigation or interrogation shall be conducted under the following conditions:
>
> \*　　　\*　　　\*
>
> (12)(i) A law enforcement agency may not insert any adverse material into any file of the officer, except the file of the internal investigation or the intelligence division, unless the officer has an opportunity to review, sign, receive a copy of, and comment in writing upon the adverse material, unless the officer waives these rights.

Anastasi's argument fails because the rights embodied in § 728(b)(12)(i) only attach, as the preliminary part of subsection (b) makes clear, when "a law enforcement officer is under investigation or subjected to interrogation by a law enforcement agency ..." This point has been recognized numerous times by both this Court and the Court of Appeals. *See Leibe v. Police Department of Annapolis,* 57 Md.App. 317,

323, 469 A.2d 1287 (1984) (Tracking of police officer's use of sick leave was not an "investigation" which triggers procedural protections of § 728 of Article 27). *Cf. Miner v. Novotny*, 304 Md. 164, 173, 498 A.2d 269 (1985) ("The LEOBR ... [is] designed to provide a law-enforcement officer covered by the statute with substantial procedural safeguards during any inquiry into his conduct."); *DiGrazia v. County Executive for Montgomery County*, 288 Md. 437, 452, 418 A.2d 1191 (1980) ("The legislative scheme of the LEOBR is simply this: Any law enforcement officer covered by the Act is entitled to its protections during any inquiry into his conduct which could lead to the imposition of a disciplinary sanction."). In this case, there was clearly no such "investigation;" rather, the memos at issue were generated as part of a promotional process, for the purpose of warning the Department's senior officers that Anastasi should not be elevated to lieutenant. Accordingly, there was no violation of Anastasi's rights under the LEOBR.

### III. Alleged Violation of Administrative Procedure

Anastasi also argues that his inability to respond to the memos in that file violated his rights under § 3.5 of Montgomery County Administrative Procedure 4–8, which provides, in relevant part:

No information shall be placed in an employee personnel record unless the employee receives a copy of the information and is provided an opportunity to submit a rebuttal, if desired, to be included in the file.

We agree.

Administrative Procedures in Montgomery County help govern (along with applicable portions of the Montgomery County Charter, the Montgomery County Code, county regulations and bulletins, and executive orders) the internal management of Montgomery County agencies and departments. *See* Montgomery County Code § 2A–13 (1997) (defining "Administrative Procedure" as "a written directive concerning the internal management of one or more than one

county agency or department."). Thus, to the extent that Administrative Procedures apply to a particular county agency or department, and to the extent that they have the force and effect of law, and are not simply interpretive rules, policy statements, or other, lesser, rules of agency organization, procedure or practice, that agency or department, under the well-known *Accardi* doctrine, must follow them; and if the agency or department fails to follow such Administrative Procedures when taking an action, then the agency's action is invalid. *See Board of School Commissioners v. James*, 96 Md.App. 401, 421–22, 625 A.2d 361, *cert. denied*, 332 Md. 381– 82, 631 A.2d 451 (1993) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268, 74 S.Ct. 499, 98 L.Ed. 681 (1954)).[8]

■ In determining whether an agency rule has sufficient force and effect to trigger an application of the *Accardi* doctrine, Maryland courts generally look to see whether it "affects individual rights and obligations," *See James*, 96 Md.App. at 422, 625 A.2d 361 (quoting Peter Raven–Hansen, *Regulatory Estoppel: When Agencies Break Their Own "Laws"*, 64 Tex. L.Rev. 1, 16 (1985)), or whether it confers "important procedural benefits upon individuals." *Board of Education of Anne Arundel County v. Barbano*, 45 Md.App. 27, 41, 411 A.2d 124 (1980). *See also Chrysler Corporation v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (a "characteristic inherent" in a legislative-style rule is that it affects "individual rights and obligations' ") (quoting *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)). The agency rule at issue here—Administrative Procedure 4– 8—is actually an extensive scheme of regulations whose pur-

---

**8.** As the *James* Court made clear, even if an agency rule does not have the force and effect of law (that is, even if it is simply interpretive, a statement of policy, or any other, lesser, rule of agency organization, procedure, or practice), a violation of that rule will still invalidate an agency's action if the complainant can show that he was substantially prejudiced by the violation. However, given that Administrative Procedure 4–8 does have the force and effect of law (See discussion, *infra* ), Anastasi does not have to make such a showing.

pose is "[t]o establish a procedure for review of employee personnel records, and to identify all organizations of the County Government which maintain personal information concerning employees." Montgomery County Administrative Procedure 4–8, § 1.0. To that end, Administrative Procedure 4–8 sets a series of strict constraints on the contents of, and access to, files on county employees. For example, § 3.6 of Administrative Procedure 4–8 delineates all those who may have access to an employee's personnel record; it reads:

To preserve confidentiality and protect the privacy of employees, access to an employee's personnel records shall be restricted to the following:

A. Employee who is the subject of the file or authorized representative.

B. Employee's supervisor. (Need to know basis)

C. Appointing authority considering an employee for appointment, promotion or transfer after the employee has been interviewed and rated. (Need to know basis)

D. Personnel Director or designee. (Need to know basis)

E. Member or Merit System Protection Board or designee. (Need to know basis)

F. County Attorney or designee. (Need to know basis; i.e. when employee is in litigation against the County, e.g. Merit System Protection Board, Workmen's Compensation, Disability, Retirement, etc.)

G. Chief Administrative Officer or designee. (Need to know basis)

Similarly, § 4.0 outlines the permissible contents of an employee's personnel record; it reads:

The contents of an employee's official personnel file shall be limited to:

A. Applications for employment or promotion which resulted in appointment or promotion.

B. Employment history, including personnel action documents affecting appointment, promotion, transfer, salary change, etc.

C. Copy of commendations.

D. Employee emergency information.

E. Payroll withholding documents.

F. Insurance and retirement records.

G. Education and training records.

H. Performance evaluations—limited to last five years only.

I. Leave records—limited to last five years only.

J. Results of tests and examinations successfully completed—limited to two years from date of test or examination.

K. Copy of disciplinary actions.

L. Copy of reprimands—limited to two years only.

■ From these limited examples (Administrative Procedure 4–8 is too long to be reproduced fully in this opinion), it should be clear that Administrative Procedure 4–8 significantly affects individual rights and obligations, and confers important procedural benefits upon employees of Montgomery County. Thus, it should be clear that the dictates of Administrative Procedure 4–8 have the force and effect of law, and that any violations of its provisions trigger an application of the *Accardi* doctrine.

The question thus becomes whether the Department violated § 3.5 of Administrative Procedure 4–8 when it maintained, during the relevant promotional cycle, a file containing, *inter alia,* three memos—one written by King, one written by McKenna, and one written by Mehrling—adverse to Anastasi, and did not either notify Anastasi of the existence of those memos, or allow him to respond to them in writing. Again, § 3.5 of Administrative Procedure 4–8 provides:

No information shall be placed in an employee personnel record unless the employee receives a copy of the information and is provided an opportunity to submit a rebuttal, if desired, to be included in the file.

The answer to this question turns on whether that file was a "personnel record." The term "personnel record" is defined as follows:

The repository of official information regarding an active, terminated or retired employee of Montgomery County Government. A personnel record can be a personnel, medical or departmental operating file.

█ Montgomery County appears to argue that the file was not a "personnel record" because it did not contain "official information" on Anastasi. We believe otherwise. Giving the term its ordinary signification[9], "official information" means information that is both authorized, and which relates or refers to an office or position. *See* Webster's New Collegiate Dictionary (1981) (defining the adjective "official" as "of or relating to an office, position, or trust ... authoritative, authorized ... prescribed or recognized as authorized ..."). The memos written by King, McKenna, and Mehrling were authorized, and related to Anastasi's position in the Department. Thus, the file was clearly a "personnel record," and Anastasi was entitled to receive a copy of the memos contained in that file, and to respond to them in writing. Because Anastasi was never given the opportunity to either see or respond to those memos, the Department violated Administrative Procedure 4–8.

## IV. Alleged Violation of Personnel Regulation 23–2

Anastasi also argues that, even if there had been no violation of Administrative Procedure 4–8, the Department's use of the King, McKenna, and Mehrling memos would have been improper because of Montgomery County Personnel Regulation 23–2, which provides, in relevant part, that a promotional program should provide "[q]ualified employees an opportunity to receive fair and appropriate consideration for higher level

---

9. We believe that the language of § 2.1 is clear and unambiguous. Pursuant to applicable rules of statutory construction, we give statutory · language its ordinary meaning if it is clear and unambiguous. *See Schweitzer v. Brewer*, 280 Md. 430, 438, 374 A.2d 347 (1977) (Stating that goal of statutory construction is to effectuate legislative intent, and that the primary source for determining intent is the language of the statute; also stating that if "the intent is expressed in clear and unambiguous language, [a Court] will carry it out," and that "[w]ords are granted their ordinary signification....").

positions ..." According to Anastasi, the very use of the King, McKenna, and Mehrling memos is discriminatory, and thus violates Regulation 23–2.

■ This argument is entirely without merit. Had Anastasi been given an opportunity to respond to them, there would have been nothing discriminatory or unfair about the use of those memos. Indeed, because they come from officers with direct knowledge of Anastasi's abilities, they are a legitimate source of information on Anastasi. Thus, to the extent that the Department follows the dictates of Administrative Procedure 4–8, its use of the King, McKenna, and Mehrling memos does not violate Montgomery County Personnel Regulation 23–2.

## V.   Consideration of Carwash Incident

Again, on August 10, 1994, Anastasi filed a grievance over King's "Planning and Performance Appraisal," which was critical of Anastasi's performance in a number of areas (and not just of the carwash incident). Then–Chief Edwards granted the grievance, and agreed that if Anastasi received positive recommendations by November of 1994, King's evaluation would be "destroyed."

In November of 1994, Anastasi received the positive recommendations required by Edwards's decision. Thus, King's evaluation was destroyed. Edwards also decided, informally, that he would no longer pass over Anastasi for promotion—a decision that Mehrling overruled when she became Chief of Police.

Anastasi now argues that because of Edwards's resolution of the grievance, and because of Edwards's decision to consider Anastasi for promotion, Mehrling was not entitled to use the carwash incident in her evaluation of Anastasi. We disagree.

■ The fact is that the decision to destroy King's "Planning and Performance Appraisal" was simply that—a decision to destroy King's "Planning and Performance Appraisal." It

was not a decision to prohibit consideration of the carwash incident.

Similarly, the decision by Edwards to give Anastasi a second chance was not a decision to prohibit consideration of the carwash incident. It was simply a discretionary decision on Edwards's part, in his role as the appointing authority, to consider Anastasi for the next opening. Accordingly, Edwards issued no decision prohibiting consideration of the carwash incident, and the Department was entitled (and, subject to the constraints of all applicable laws and regulations, is still entitled) to use that incident in its evaluation of Anastasi.

## VI. Promotion of Lieutenant Dooley

When Lieutenant Dooley was promoted, he was temporarily placed, as a sergeant, in an open position that was advertised several weeks later as one for a lieutenant. Dooley was then considered, along with several other candidates, for the position; and he was ultimately awarded the job, and promoted to lieutenant.

Anastasi argues that the pre-placement of Dooley in that job violated Montgomery County Personnel Regulation 23–4, which provides, in relevant part:

On the recommendation of a department head, the Chief Administrative Officer may approve a temporary promotion on a non-competitive basis, not to exceed 12 months without approval of the Merit System Protection Board.... This must not give the employee a priority claim or competitive advantage when the position is announced as a promotional opportunity.

According to Anastasi, the pre-placement of Dooley gave him the kind of competitive advantage prohibited by Montgomery County Personnel Regulation 23–4.

The question of whether Dooley's pre-placement gave him a competitive advantage over the other candidates is a question of fact. The Merit Board found that Dooley had no such competitive advantage, and based that conclusion on

Mehrling's testimony that she decided to pass over Anastasi for the opening, and that, using the rank order with exception procedure, the committee of senior officers recommended Dooley for promotion. This testimony is sufficient to support the factual finding of the Merit Board. Accordingly, we must uphold that finding.

### Conclusion

The final question here is what kind of remedy to afford Anastasi for the Department's violation of Administrative Procedure 4–8.

Anastasi asks that we order his promotion to lieutenant, retroactive to the spring of 1995. That we are extremely unwilling to do. Anastasi's acts of dishonesty raise very serious questions, in our minds, about his fitness for promotion to a relatively high-ranking position in the Department. Furthermore, the decision to promote, at least in this case, is not one that is proper for us to make; that decision is best left to the Department itself.

■■■ The appropriate remedy, we believe, is to allow Anastasi to respond to the adverse memos in the file (thus restoring his rights under Administrative Procedure 4–8), and then to be considered again for promotion during the better part of a future promotional cycle. If, after allowing Anastasi to respond to the memos, the Department decides that it does not want to promote him, such a decision would be valid (as long as all other procedural requirements are met). But such reconsideration is necessary to rectify the violation of Anastasi's rights under Administrative Procedure 4–8.

The details of that reconsideration (such as whether Anastasi should have to wait for the start of a new promotional cycle, which eligible list he should be placed on, or what his ranking on the eligible list should be) are best left to the discretion of the Merit Board. Thus, we will remand the case to the Merit Board for the purpose of working out those details.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED**

TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE MERIT SYSTEM PROTECTION BOARD FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

APPELLEE TO PAY THE COSTS.