823 A.2d 626

Michael POLLOCK,

v.

PATUXENT INSTITUTION BOARD OF REVIEW.

**No. 106, Sept. Term, 2002.**

Court of Appeals of Maryland.

May 8, 2003.

464

Mark Gitomer (The Law Office of Mark Gitomer, on brief), Owings Mills, for petitioner/cross-respondent.

Andrew H. Baida, Solicitor General (J. Joseph Curran, Jr., Attorney General of Maryland and Scott S. Oakley, Assistant Attorney General, on brief), Baltimore, for respondent-cross-petitioner.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JJ.

CATHELL, Judge.

Since 1991 there has been recurring litigation between Michael Pollock, petitioner/cross-respondent (hereafter "petitioner") and the Patuxent Institution Board of Review, respondent/cross-petitioner (hereafter the "Board"). This is the second time a case between these parties has been before this Court. We granted certiorari in this appeal to decide whether positive urinalysis drug test results of a sample supplied by petitioner should have been excluded from evidence at petitioner's parole revocation hearing due to the failure of the staff of the Patuxent Institution (hereafter "Patuxent") to strictly comply with its own directive setting forth technical collection and documentation procedures for urinalysis samples.

In a previous appeal petitioner raised the issue that Patuxent's procedures had not been complied with and further that the chain of custody as to his specimen was improperly preserved. *Pollock v. Patuxent Institution Board of Review,* 358 Md. 656, 751 A.2d 496 (2000) (*Pollock I*). We remanded this case back to the Circuit Court for Howard County for it to decide whether the Board's decision not to renew petitioner's parole on the basis of the urinalysis results was arbitrary or capricious. On remand, the circuit court found that the urinalysis results were properly admitted and considered by the Board in revoking, and then not renewing, petitioner's parole order and specifically found that the Board's decision was not arbitrary or capricious. On September 3, 2002, the Court of Special Appeals affirmed. *Pollock v. Patuxent Institution Board of Review,* 146 Md.App. 54, 806 A.2d 388 (2002). On December 19, 2002, we granted both the writ of certiorari filed by petitioner and the conditional cross-petition filed by the Board. *Pollock v. Patuxent,* 372 Md. 429, 813 A.2d 257 (2002) (*Pollock II*). Petitioner presents two questions for our review:

"1. Is the *Accardi* doctrine and its exceptions, as explicated by the Supreme Court in *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681

(1954) and its progeny, applicable to administrative hearings in Maryland? [1]

"2. If the answer to question number 1 is 'yes,' did the Court of Special Appeals erroneously apply the exception in this case?"

The Board essentially asked this Court to consider the same question as petitioner's question one, but phrased its question as follows:

"Does the Board's technical non-compliance with an internal Patuxent directive, which sets forth procedures governing the collection and handling of urine specimens from Patuxent inmates for the purpose of detecting illicit drug use, provide a basis for either invalidating the Board's revocation and non-renewal of Pollock's parole, or excluding the urinalysis drug test results upon which the Board based its decision?"

We adopt the *"Accardi* doctrine" and hold that it is applicable to administrative hearings in Maryland. We hold, however, that in the case *sub judice*, the Court of Special Appeals did not erroneously apply one of the exceptions under *Accardi* and its progeny. Patuxent's failure to comply with a part of its directive [2] pertaining to the collection and handling of urine

---

**1.** The *"Accardi* doctrine,"* as we further discuss *infra*, is the oft-cited case created rule of administrative law that, when applicable, states that an administrative decision is subject to invalidation when the agency's "failure to exercise its own discretion, [is] contrary to existing valid regulations." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268, 74 S.Ct. 499, 504, 98 L.Ed. 681, 687 (1954) (alteration added). Subsequent to *Accardi*, in a series of cases the Supreme Court has recognized a rule of federal administrative law that requires, with some exceptions, an administrative agency to generally follow its own procedures or regulations.

At the outset, we note that the *Accardi* doctrine has been applied in a variety of contexts and interpreted differently by various jurisdictions.

**2.** The Patuxent directive at issue in the case *sub judice* is Patuxent Institute Directive 110–18 (hereafter "PID 110–18") governing urinalysis testing. The portions of PID 110–18 at issue in this case are as follows:

specimens does not require the reversal of the Board's action to revoke and not renew petitioner's parole because the failure to comply technically with all of the PID 110–18 did not implicate fundamental constitutional rights of petitioner nor violate statutorily mandated procedure. What occurred constituted a technical mistake which did not substantially prejudice petitioner.[3] We hold that when the *Accardi* doctrine,

---

"2. Each request for a urinalysis test shall be documented by an Incident Report (Appendix A) and a Request for Urinalysis Test (Appendix D)....

"4. The urine specimen shall be collected from the inmate as follows:
. . .

c. Staff,shall hand to the inmate the specimen bottle, pre-labeled with the inmate's name, number, and date. This information shall be handwritten. The inmate shall be asked to acknowledge that information on the label is correct.... The bottle number shall be noted on the Incident Report Form (Appendix A).

d. When the inmate has handed the filled bottle back to staff, staff shall ensure that the bottle is tightly capped, and then shall properly secure a piece of 'Evidence Tape' over the cap and to the sides of the bottle....

f. The collection of the urine specimen ... shall be documented on the Incident Report (Appendix A).

g. The original copy of the Medical Laboratory Chain of Custody Form shall be retained until the specimens are picked up for testing. The original copy shall be signed by and released to the Medical Laboratory courier. The duplicate copy shall be sent to the Major's office.

"5. The urine specimen shall be handled and processed as follows:

a. The number of staff handling the specimen should be minimized. All items shall then be placed in the refrigerator in the Major's area. At all times, the specimen should be in the actual possession and control of staff or secured in a manner which does not compromise the integrity of the chain of custody...."

3. The Administrative Procedure Act which is codified in the Maryland Code (1984, 1999 Repl.Vol., 2001 Supp.), Section 10–101 *et seq.* of the State Government Article (hereafter "APA") (Unless otherwise indicated, all statutory references hereafter are to this section of the Maryland Code), is instructive in this case not only as a statute governing administrative procedures but, additionally, as a legislative statement of policy. The relevant provision of the APA that is instructive in the case *sub judice* is section 10–222 on judicial review. The pertinent portions of this section provide:

"§ 10–222. Judicial review

(a) *Review of final decision.*—(1) Except as provided in subsection (b) of this section, a party who is aggrieved by the final decision in a contested case is entitled to judicial review of the decision as provided in this section.

with its exceptions, is applicable, a complainant must also show prejudice to have the agency action invalidated.

---

(2) An agency, including an agency that has delegated a contested case to the Office, is entitled to judicial review of a decision as provided in this section if the agency was a party before the agency or the Office.

. . .

(h) *Decision.*—In a proceeding under this section, the court may:
(1) remand the case for further proceedings;
(2) affirm the final decision; or
(3) reverse or modify the decision *if any substantial right of the petitioner may have been prejudiced* because a finding, conclusion, or decision:
(i) is unconstitutional;
(ii) exceeds the statutory authority or jurisdiction of the final decision maker;
(iii) results from an unlawful procedure;
(iv) is affected by any other error of law;
(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or
(vi) is arbitrary or capricious." [Emphasis added.]

This section of the APA provides that when the courts are undertaking judicial review of an administrative agency action subject to the Administrative Procedure Act, courts may reverse or modify the decision of the administrative agency if both a substantial right of the petitioner has been violated and the petitioner "may have been prejudiced" by that departure from the prescribed procedure. Therefore, in respect to agencies governed under the APA, if a court finds that substantial rights of a petitioner have been improperly prejudiced by a departure from procedures, then it is the function of the court to reverse or modify the order. *See Bernstein v. Real Estate Comm'n*, 221 Md. 221, 156 A.2d 657 (1959), *appeal dismissed*, 363 U.S. 419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960). Maryland courts have recognized that the order of an administrative agency must be upheld on review if it is not premised upon an error of law and if the agency's conclusions on questions of fact or on mixed questions of law and fact are supported by substantial evidence presented to it. *Kohli v. LOOC, Inc.*, 103 Md.App. 694, 654 A.2d 922 (1995), rev'd in part on other grounds and remanded, *LOOC, Inc. v. Kohli*, 347 Md. 258, 701 A.2d 92 (1997).

Therefore, essentially, the APA incorporates the legislative public policy statement in setting forth statutory requirements for agencies to which it applies and what prohibitions exist for such agencies in the carrying out of their business. As indicated, the APA basically provides that if a covered agency's departure from requirements affects fundamental rights and prejudices a petitioner, its action is subject to be reversed or modified by the courts. *See* A. Rochvarg, *Maryland Administrative Law* 131 (2001), where that author stated that "A party aggrieved by an agency decision must demonstrate in order to have a court reverse and vacate the agency decision that the party was prejudiced by the error." (citing section 10–222(h)(3) of the APA).

■■■■■■■■■■■■

Because this appeal involves a long-standing dispute and is the result of recurring litigation, the facts and legal proceedings to date need not be rewritten as the facts of this contested administrative case are settled. As such, we adopt the facts and legal proceedings which were recently and thoroughly summarized by Judge Adkins when this case was below. She wrote:

## "FACTS AND LEGAL PROCEEDINGS

### The Test

"Pollock, who killed a cab driver during an argument, was incarcerated in the Maryland Division of Correction as inmate number 4695 on November 23, 1971. He is serving a life sentence with the possibility of parole for first degree murder, plus two years consecutive for escape.

"In April 1980, Pollock was committed to Patuxent as a person eligible for Patuxent programs. He became eligible for parole in December 1985, and was paroled in September 1988. Pollock's most recent parole order was issued in June 1996, with an expiration date of May 1997.

"One condition of Pollock's parole was annual urinalysis testing to determine whether he was in compliance with the 'no drugs' and 'obey all laws' requirements of his parole order. On May 15, 1997, Pollock arrived at Patuxent to submit a urine sample. The specimen associated with Pollock tested positive for marijuana. According to Pollock, what happened during the collection and testing of this specimen requires exclusion of those test results.

"Sgt. A.P. Jones was on duty when Pollock arrived. Jones completed the required 'Request for Urinalysis Test' form, certifying that 'Micheal [sic] Pollock' had verified his identity by 'I.D. card.' Jones certified, by signing the form, that Pollock had

'submitted a urine specimen in my presence in a specimen bottle labeled with the inmate's name and number and today's date, and thereafter the inmate handed me the

---

The Administrative Procedure Act does not apply to respondent's action in this case, but the *Accardi* doctrine as we shall adopt it, and the provisions of the APA are substantially similar.

bottle. I thereafter sealed the bottle with evidence tape, and maintained exclusive possession and control of the bottle until I transferred it from my possession and control as indicated below:....

'CHAIN–OF–CUSTODY OF SPECIMEN:

From above-named inmate To APJones Date 5–15–97 Time 10:30 AM

From APJones To Lock Refrigerator Date 5–15–97 Time 10:33 AM

From Capt. L. Latham To P. Stuffey Date 5–15–97 Time 1:40 PM'

"Apparently in an attempt to use Pollock's inmate number as the number identifying Pollock's urine specimen, Jones filled in the blank for 'number' on that form with '**4697.**' (Emphasis added.)

"At the same time he obtained Pollock's sample, Jones also completed another required Patuxent form, entitled 'Incident Report.' Jones completed the 'nature of incident' blank with the following handwritten note:

'On the above date and approx. time the above named inmate gave a urine sample for drug testing. The test was administered by this writer and observed by CO D[.] Taylor. The sample was secured in the locked refriger-ator in the infirmary....'

Jones also used number **4697** on that Incident Report.

"A third form completed at the time Pollock submitted his urine sample, was entitled:

### 'Friends Medical Laboratory

Laboratory Testing Requisition Form'

"This form identified Patuxent as the 'Collection Site' for '7' different specimens, one collected on May 8, another on May 10, and five on May 15, 1997. Listed under the 'Specimen Identity' column of this form were handwritten names of seven different inmates. Each name appeared in a separately numbered box. The first line in each box

identified the inmate's name in manuscript with a corresponding inmate number. On the second line, appearing right below the manuscript name and inmate number, each inmate signed the form.

" 'Michael Pollock # 4669' is identified as the fourth specimen, dated '5–15–97,' and 'collected by A.P. Jones & D. Taylor.' (Emphasis added.) In cursive, under his manuscript name and number, Michael Pollock signed his name and correctly identified himself as '# 4695.' (Emphasis added.) The form indicates 'Capt. L. Latham' 'released' the specimens to a courier from Friends Medical Laboratory ('Friends') on '5/15/97' at '1:35 pm.' and authorized Friends to test the specimens.

"The next day, on May 16, 1997, Friends tested a urine sample received on '05/15/97' that it identified as belonging to 'Client: Pollock, Michael 4669.' (Emphasis added.) The results of this test showed that the sample was positive for marijuana. Friends faxed a copy of the test results to Patuxent on May 19, 1997.

"A parole revocation warrant was issued immediately. On May 20, Pollock surrendered and was returned to Patuxent. At a May 22 preliminary revocation hearing, Pollock denied using marijuana, but 'admitted that he had been briefly in the presence of suspected marijuana smokers[.]' The hearing officer found probable cause for charges that Pollock had violated the terms of his parole, and ordered a parole revocation hearing.

"On May 23, at the request of Patuxent, Friends performed a 'confirmation re-test,' with the same results. The confirmation test report identified the 'client' from whom the sample was taken with the same typewritten 'Pollock, Michael' that appeared on the original test report, but without the incorrect typewritten inmate number '4669.' Instead, handwritten immediately beneath Pollock's name is the following notation: '4695 Ref–P.' (Emphasis added.) It is unclear whether the person who added the handwritten inmate number was someone at Friends or at Patuxent.

## "Revocation And Non–Renewal"

"Pollock's parole revocation hearing began on June 19, 1997 and concluded on July 17, 1997. At the hearing, Pollock moved to dismiss the revocation proceedings because he had not received timely notice of the hearing pursuant to Patuxent Institution Regulation ('PIR') 240–19.V.C. Additionally, Pollock moved to exclude the urinalysis reports on the ground that there were violations of the chain of custody procedures and documentation requirements established by Patuxent Institution Directive ('PID') 110–18.[4]

"The Board denied both motions. Based on the test results from Friends, it concluded that Pollock had used marijuana in violation of the terms of his parole. '[D]ue to the seriousness of these violations,' the Board ruled that Pollock was 'no longer eligible for Patuxent programs.' As a result, Pollock was transferred to another correctional facility within the DOC to serve the remainder of his sentence.

"In August 1997, Pollock appealed the Board's decision to the Circuit Court for Howard County. He argued that the Board violated its own rules by failing to provide timely notification of the revocation hearing and that the urinalysis test results were inadmissible because a chain of custody was never established. Patuxent responded that the issues raised by Pollock were moot because Pollock's parole order had expired before the July 1997 parole revocation hearing, and, alternatively, that there was sufficient evidence to establish a chain of custody for Pollock's specimen.

"On April 15, 1998, the circuit court reversed the Board's decision to revoke Pollock's parole, ruling that the Board was late in notifying Pollock of the revocation hearing. The

---

4. Footnote one in the intermediate appellate court's opinion read, "Pollock also testified on his own behalf, suggesting that the positive test results might have reflected medication he took for a heart condition, 'second-hand smoke' to which he was exposed, or retribution by a friend."

circuit court, however, did not address whether the urinalysis results could be used against Pollock as grounds for revocation of his parole.

"As a result of this order, the Attorney General advised Patuxent that Pollock

'must be brought back to the Patuxent Institution and either (1) be declared a "non-eligible person" based on facts other than the parole revocation (although the Board may consider the positive urinalysis that [led] to the revocation); or (2) return the inmate to parole as an eligible person; (3) reinstate the eligible person status, but factually determine that parole is not appropriate through the "annual review" process (rather than in conjunction with a parole revocation).'

"Patuxent chose the third option. On May 8, 1998, it advised Pollock that, during his appeal of the Board's revocation decision, 'your annual review for parole status ... lapsed.' Accordingly, an annual parole review hearing was scheduled for May 21, 1998.

"In response to this notice, on May 13, 1998, Pollock filed a *habeas corpus* petition in the Circuit Court for Howard County. Shortly thereafter, at the May 21 annual review hearing, the Board relied on the positive urinalysis results in deciding not to renew Pollock's parole. Noting 'the legal implications of this case,' the Board returned Pollock to Patuxent as 'an Eligible Person,' where he was 'put on [the] drug tier.'

"On June 2, 1998, the circuit court held a hearing on Pollock's *habeas* petition. A year later, on June 30, 1999, the circuit court denied *habeas* relief because Pollock's parole had expired, so there was 'no parole to which Pollock could be restored.'

"Pollock appealed that decision to th[e] Court [of Special Appeals], raising both constitutional and procedural arguments. [The Court of special Appeals] affirmed in an unreported decision that adopted the circuit court's rationale. *See Pollock v. Patuxent Inst. Bd. of Review*, No. 1657,

Sept. Term 1998, 127 Md.App. 790 (filed June 14, 1999). The Court of Appeals granted *certiorari* to consider whether a Patuxent parolee has a constitutional right to remain on parole until the parole is revoked in accordance with a revocation proceeding that meets 'due process' standards. *See Pollock v. Patuxent Inst. Bd. of Review,* 358 Md. 656, 666, 751 A.2d 496 (2000). The Court, however, ultimately declined to decide that question until all of the non-constitutional questions were resolved. *See id.* at 666–67, 751 A.2d 496. It vacated this Court's decision and remanded the *habeas* petition because Pollock had 'never obtained judicial review of the use of the May 1997 report of urinalysis either as the basis for the original revocation or as the basis for the May 21, 1998 non-renewal on annual review.' *Id.* at 668, 751 A.2d 496.

"On remand, by written order dated June 27, 2001, the circuit court found that the testimony and documents presented by the Board

'constitute[ ] "substantial evidence" in support of the conclusion that the sample submitted by Mr. Pollock contained marijuana in violation of his conditions of parole. The testimony and exhibits show directly, or support a reasonable inference, that all requirements of ... PID No. 110–18 concerning the taking, storage, transfer and testing of the sample were complied with, even if one page of the chain of custody [form] was not introduced as an exhibit. The content of that page and the compliance of that document with PID No. 110–18 was testified to by Sgt. A.P. Jones.'[5]

5. The circuit court judge went on to conclude that:

"The finding that there was substantial evidence in the record as a whole to support the finding that [petitioner's] urine sample from May 15, 1997, contained marijuana in violation of his conditions of parole, fully justified the revocation of parole. That urinalysis along with his previous record of violating work release and previous [record of violating] parole because of controlled dangerous substances in his body while out of the institution fully support the May 21, 1998 determination not to renew parole for Mr. Pollock. Consequently, the Court finds the action of the Board of Review in revoking

The *habeas* court held that both the decision to revoke Pollock's parole and the decision not to renew it were 'fully justified' by 'the finding that Mr. Pollock's urine sample from May 15, 1997, contained marijuana in violation of his conditions of parole.' It is from this decision that Pollock now appeals."

## I. Standard of Review

In our recent case of *Jordan Towing, Incorporated v. Hebbville Auto Repair, Incorporated,* 369 Md. 439, 449–52, 800 A.2d 768, 774–75 (2002) (quoting *Gigeous v. ECI,* 363 Md. 481, 495–97, 769 A.2d 912, 921–22 (2001), we discussed the review of an administrative agency's decision. We stated that:

" 'We review an administrative agency's decision under the same statutory standards as the Circuit Court. Therefore, we reevaluate the decision of the agency, not the decision of the lower court. Moreover ... we stated that "[j]udicial review of administrative agency action is narrow. The court's task on review is *not* to substitute its judgment for the expertise of those persons who constitute the administrative agency." . . . .

. . .

■ 'We, however, "may always determine whether the administrative agency made an error of law. Therefore, ordinarily the court reviewing a final decision of an administrative agency shall determine (1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision." ... Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ... we further explained:

"The scope of review is limited to whether a reasoning mind could have reached the factual conclusion the agency

---

[petitioner's] parole and in subsequently not renewing his parole because of the positive urinalysis was not arbitrary and was not capricious." [Alterations added.]

reached. In applying the substantial evidence test, the reviewing court should not substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken. The reviewing court also must review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity.[6] Furthermore, not only is the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences." ' "

*Id.* (citations omitted) (footnote added).

## II. Discussion

"[Petitioner] asserts that the Board's finding that the positive urine specimen was the same urine specimen collected from [him] on May 15, 1997 was clearly erroneous because that fact 'was never established with any reasonable degree of certainty.' " *Pollock,* 146 Md.App. at 65, 806 A.2d at 394. Additionally, petitioner asserts that the Board " 'was incorrect as a matter of law' in admitting the test results at the parole revocation hearing and later, when not renewing his parole, because PID 110–18, entitled " 'Urinalysis Testing,' " " 'sets forth a *mandatory* procedural framework that must be followed when obtaining and testing a Patuxent inmate's urine for illicit drugs.' " *Id.* Petitioner has argued that there were four violations that rendered the Board's decision to admit the urinalysis results "arbitrary and capricious," *i.e.,* the use of the wrong inmate number, improper securing of the required evidence tape, lack of documentation regarding a second offi-

---

**6.** The Court of Special Appeals has stated that "an agency is best able to discern its intent in promulgating a regulation. Thus, an agency's interpretation of the meaning and intent of its own regulation is entitled to deference." *Changing Point, Incorporated v. Maryland Health Resources Planning Commission,* 87 Md.App. 150, 160, 589 A.2d 502, 506 (1991) (citation omitted).

cer who handled the sample and lack of a signed copy of the Medical Laboratory Chain of Custody Form.

Moreover, although petitioner admits that the intermediate appellate court properly acknowledged its prior cases in which it held that an agency must scrupulously follow its rules and regulations under the "*Accardi* doctrine" (which adherence petitioner alleges is lacking in this case), he asserts that the intermediate appellate court improperly went further when it held that PID 110–018 at issue met the *Accardi* exception which provides that the *Accardi* doctrine does not apply to an agency's departure from procedural rules adopted for the orderly transaction of agency business.[7]

The intermediate appellate court relies on this exception, which indicates that not every internal procedural policy, rule or regulation adopted by an agency invokes the *Accardi* doctrine. The intermediate appellate court so held after a detailed discussion and conclusion that the title, stated purpose, language and history of the directive "collectively indicate that it was not primarily designed to guarantee parolees that their urine specimens will be collected and documented in precisely the manner described in the directive" and that the "provisions indicate that Patuxent's primary purpose for this directive is to promote the use of urinalysis testing as a means of controlling drug use by inmates, not to establish a precise rubric for conducting such drug testing." *Pollock*, 146 Md. App. at 74–75, 806 A.2d at 400. In other words the drug screening procedure was adopted in order Patuxent to be better able to control drug use among its population. It was not a special procedure only used for purposes of parole revocation or renewal hearings.

After holding that the *Accardi* exception was applicable, the Court of Special Appeals further opined that:

"That conclusion does not end our inquiry. An agency does not have *carte blanche* to violate its own procedural policy merely because it is not subject to the *Accardi*

---

7. We discuss in detail *infra*, the "*Accardi* doctrine" and this exception.

doctrine. An agency's failure to follow its 'internal administrative procedures' may require reversal of the agency's action if *'the complaining party can show substantial prejudice.'* Thus, 'even if an agency rule does not have the force and effect of law (that is, even if it is simply interpretive, a statement of policy, or any other, lesser, rule of agency organization, procedure, or practice), a violation of that rule will still invalidate an agency's action if the complainant can show that he was substantially prejudiced by the violation.'

"The question of whether [petitioner] was substantially prejudiced by any violation of PID 110–18 dovetails with the remaining question raised by [petitioner's] appeal: whether the Board and the circuit court erred in concluding that the test results provided valid and sufficient grounds for revoking and then not renewing [petitioner's] parole. . . .

. . .

"There is enough evidence in this administrative record to support the Board's finding that the positive urine specimen belonged to [petitioner]. Because the Board's decision was supported by substantial evidence that [petitioner] violated his parole by using marijuana, including the positive urinalysis test results, and it committed no error of law, we must affirm its decision."

*Id.* at 76–77, 82, 806 A.2d at 401, 405 (citations omitted) (emphasis added) (alterations added).

In the case now before us, the Board argues that:

"Pollock has neither argued nor shown that he has suffered any prejudice that results from the actions he alleges Patuxent committed. Those actions consist solely of a technical non-compliance with Patuxent's urinalysis testing directive, and did not compromise the integrity of the laboratory test results establishing that [petitioner] used illicit drugs in violation of the conditions of his parole. This is not enough to warrant either reversing the Board's decision to revoke [petitioner]'s parole or excluding the urinalysis test results from his parole hearing." [Alterations added.]

The Board also contends, moreover, that the Court of Special Appeals was incorrect to hold that "the *Accardi* doctrine would require the *per se* exclusion of the Friends lab report if Patuxent staff members did not strictly comply with PID 110–18." *Pollock*, 146 Md.App. at 69, 806 A.2d at 397. The Board argues that the intermediate appellate court's view of a *per se* exclusion upon a finding of an agency violation is incorrect, that is, that the Court of Special Appeals was incorrect to state that "If, as [petitioner] contends, Patuxent staff violated PID 110–18, and *if* the *Accardi* doctrine applies to those violations . . ., then the positive test results should have been excluded, without specifically inquiring whether the violations prejudiced [petitioner.]" *Id.* (alterations added) (emphasis added). The Board proffers that this position of the Court of Special Appeals' is incorrect and that "Regardless of whether the 'primary' purpose of the urinalysis testing directive is to confer important procedural benefits or to assist the agency in conducting its operations" the complainant must show prejudice and that the Court of Specials Appeals' stance on prejudice is not in line with Supreme Court cases, the doctrine of Maryland administrative law embodied in the APA[8] and cases from this Court that have mentioned the *Accardi* doctrine. If that were the accurate statement of the Court of Special Appeals' position we would agree with the Board that it was incorrect.

The Board also proffers that the intermediate appellate court's position, that when the *Accardi* doctrine is applicable no specific inquiry need be made regarding whether the administrative agency's violations prejudiced the complainant, is a view that, while consistent with prior case law from that court and consistent with the way the intermediate appellate court has interpreted the *Accardi* doctrine in a number of cases, is wrong.

We believe that, to some extent, the Board misconstrues the Court of Special Appeals' position in this case regarding the showing of prejudice in regards to the *Accardi* doctrine.

---

8. *See supra* footnote 3.

Clearly, the portion of the intermediate appellate court's opinion in the case at bar that we just cited shows that the Court of Special Appeals has opined that an agency does not have *"carte blanche"* to violate a rule exempt from the *Accardi* doctrine merely because it was adopted for the orderly transaction of business. Thus, we understand the Court of Special Appeals' stance, as stated in this case, to be that even if the exception to *Accardi* is applicable, a complainant that can still show prejudice by the agency violation might be able to have that agency action invalidated. We agree with this position, and only reverse the Court of Special Appeals' position that, where *Accardi* is applicable and the primary *Accardi* exception is not, any agency violation of a rule or regulation is a violation *per se* and the agency action must be invalidated. In such a factual scenario, we hold that a complainant must still show prejudice to potentially have the agency action invalidated. To the extent that the Board's belief that the Court of Special Appeals' past cases are inconsistent with the position we now take might be accurate, that court's prior positions are now modified by our express holding in this case.

### a. The *Accardi* Doctrine

The *"Accardi* doctrine," which traces its roots to the Supreme Court decision of *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), has been recognized in federal and some state jurisdictions. *Accardi,* however, involved much more than mere technical violations of an internal agency regulation pertaining to the orderly transaction of agency business. It involved an attempt to bypass three levels of review required by the agency's regulations. It was not mere technical inaccuracies written on a form.

In *Accardi,* the Supreme Court reversed the denial of a request for a writ of habeas corpus where the Attorney General disregarded applicable procedures of the Board of Immigration Appeals. There, a deportable alien appealed from an order of the Board of Immigration Appeals denying his application for suspension of deportation. The procedure to be followed in processing such an application was pre-

scribed by regulations of the Attorney General acting pursuant to the Immigration Act, which called for decisions at three separate administrative levels below the Attorney General, *i.e.,* by a hearing officer, by the Commissioner and by the Board of Immigration Appeals. The Attorney General did not follow this procedure in *Accardi* because while the deportation proceeding was pending, the Attorney General sent the Board of Immigration Appeals, an administrative agency within the Department of Justice whose members serve for the Attorney General, a confidential list of "unsavory characters" who the Attorney General felt should be deported, one of whom was Accardi. The Supreme Court concluded that this communication constituted a violation of the regulations which conferred initial decision making authority upon a hearing officer, the Commissioner and the Board of Immigration Appeals, subject to review by the Attorney General.

Thus, even though the Attorney General had the final power to ultimately deport Accardi and the Attorney General had no statutory or constitutional obligation to provide for intermediate action by the Board of Immigration Appeals, the Court held that, "In short, as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board [of Immigration Appeals] or dictate its decision in any manner." *Accardi,* 347 U.S. at 267, 74 S.Ct. at 503, 98 L.Ed. at 686 (alteration added).[9]

However, as we indicated *supra,* there is a principal exception to the doctrine, which provides that the doctrine is not applicable to "an agency's departure from procedural rules adopted for the orderly transaction of agency business." *Hopkins v. Maryland Inmate Grievance Commission,* 40 Md.App. 329, 336, 391 A.2d 1213, 1217 (1978).[10] In the post *Accardi*

9. As we discuss throughout this opinion, since the decision in *Accardi,* the doctrine has sometimes been applied more generally as is displayed by the range of case law applying the doctrine. However, while *Accardi* is oft-cited, some other jurisdictions have not adopted outright the doctrine or explored the doctrine in detail.

10. We discuss some of the intermediate appellate courts cases initially, because that court has purported to adopt the *Accardi* doctrine for

case of *American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 538–39, 90 S.Ct. 1288, 1292–93, 25 L.Ed.2d 547, 553 (1970), the Supreme Court declined to set aside an order of the Interstate Commerce Commission when the Interstate Commerce Commission failed to comply with its own regulations for processing applications for temporary operating authority, and stated:

> "The rules were not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion ... nor is this a case in which an agency required by rule to exercise independent discretion has failed to do so. Thus there is no reason to exempt this case from the general principle that *'it is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party.'* "... Unlike some rules, the present ones are mere aids to the exercise of the agency's independent discretion." [Citations omitted.] [Emphasis added.]

Thus, with *American Farm Lines,* the Supreme Court limited the *Accardi* doctrine by exempting agency housekeeping regulations *unless* the violation causes substantial prejudice. This is what is commonly known as the *Accardi* exception.

In *Board of School Commissioners of Baltimore City v. James,* 96 Md.App. 401, 421–22, 625 A.2d 361, 372, *cert. denied,* 332 Md. 382, 631 A.2d 452 (1993), the Court of Special Appeals, after discussing the *Accardi* exception, stated:

> "Similarly, a failure to comply with a published statement of 'policy,'or 'internal documents' to guide employees, or agency 'guidelines,' has been held not to invalidate agency action, *absent a showing of prejudice."* [Citations omitted.] [Emphasis added.]

---

Maryland. The present case is the first case in which this Court is adopting its version of the doctrine.

Then, in *Anastasi v. Montgomery County,* 123 Md.App. 472, 491 n. 8, 719 A.2d 980, 990 n. 8 (1998), the Court of Special Appeals, when discussing the *Accardi* doctrine and the *James* case, emphasized:

> "As the *James* Court made clear, even if an agency rule does not have the force and effect of law (that is, even if it is simply interpretive, a statement of policy, or any other, lesser, rule of agency organization, procedure, or practice), a violation of that rule will still invalidate an agency's action *if the complainant can show that he was substantially prejudiced by* the violation. However, given that Administrative Procedure 4–8 does not have the force and effect of law . . ., Anastasi does not have to make such a showing." [Emphasis added.]

It is clear that the Court of Special Appeals has applied the *Accardi* exception and that if there is a showing of prejudice in such circumstances, a violation by the agency will still invalidate the agency's action.

Nonetheless, to determine whether in the first instance an agency rule triggers the application of the *Accardi* doctrine, the Court of Special Appeals has further explained that "Maryland courts generally look to see whether it 'affects individual rights and obligations,' or whether it confers 'important procedural benefits upon individuals.' " *Anastasi,* 123 Md. App. at 491, 719 A.2d at 990 (citation omitted). If so, under the Court of Special Appeals' cases the doctrine might apply. In the alternative, if the agency rule or regulation is determined to be one adopted for the "orderly transaction of agency business," then the exception to the *Accardi* doctrine is applicable.

### b. This Court and the *Accardi* doctrine

In *Hebbville,* we stated that "We have previously indicated that, generally, an administrative agency should follow its own established rules, regulations and procedures." *Hebbville,* 369

Md. at 455, 800 A.2d at 777.[11] In our recent case of *Maryland Transportation Authority v. King*, 369 Md. 274, 799 A.2d 1246 (2002), Judge Eldrige discussed the *Accardi* doctrine and general principles of Maryland administrative law, and stated: [12]

> " 'It is well established that rules and regulations promulgated by an administrative agency cannot be waived, sus-

---

**11.** Our research reflects that there is an abundance of authority apart from *Accardi* for this general doctrine that administrative agencies should follow and are generally bound to follow their own established rules, regulations and procedures. *See* the following sampling of recent out-of-state cases to this effect: *Hand v. State Department of Human Resources*, 548 So.2d 171 (Ala.Civ.App.1988); *Albazzaz v. Zollar*, 314 Ill.App.3d 97, 247 Ill. Dec 14, 731 N.E.2d 787 (2000); *City of North Vernon v. Funkhouser et al.*, 725 N.E.2d 898 (Ind.App.2000); *Cleveland Clinic Florida Hospital v. Agency for Health Care Administration, South Broward Hospital District*, 679 So.2d 1237 (Fla.Dist.App.1996); *Murphy v. Nelson*, 260 Kan. 589, 921 P.2d 1225 (1996); *The New York Times Co. v. Comm'r of Revenue, Federal Express Corp.*, 427 Mass. 399, 693 N.E.2d 682 (1998); *In the Matter of the Compensation of Scott*, 164 Or.App. 6, 988 P.2d 449 (1999); *Ogburn–Matthews v. Loblolly Partners*, 332 S.C. 551, 505 S.E.2d 598 (1998); *Peabody v. Home Insurance Co. and Comprehensive Rehabilitation Assoc.*, 170 Vt. 635, 751 A.2d 783 (2000); *Painter v. Abels*, 998 P.2d 931 (Wyo.2000).

Many cases when noting or discussing this general doctrine cite *Accardi*. Due to the abundance of case law on this general principle, it would be virtually impossible to cite or discuss every case that has cited *Accardi* in support for this principle. In this opinion, we provide a background discussion of the *Accardi* doctrine and attempt to use those cases that are more tailored and discuss at length the interpretations of the *Accardi* doctrine and how other jurisdictions have held it to impact, refine or alter their general rules of administrative law.

**12.** In *King*, Judge Eldridge also noted the lack of discussion of the *Accardi* doctrine by this Court and how, prior to *King*, "this Court has not previously discussed the *Accardi* doctrine as such, or even cited *Accardi* it is clear that, at least to some extent, a similar doctrine is reflected in Maryland administrative law." *King*, 369 Md. at 286, 799 A.2d at 1252. Therefore, the case *sub judice* presents the Court with another opportunity to further explore the *Accardi* doctrine and the extent of its applicability to administrative proceedings in Maryland. We reference this portion of the *King* opinion because it provides a concise and well written discussion on the *Accardi* doctrine and highlights the coverage of the doctrine by the Court of Special Appeals and other courts and because it was the first time this Court commented on the *Accardi* doctrine. In the present opinion, we later examine in more detail some of the cases Judge Eldridge touched upon in this portion of *King*.

pended or disregarded in a particular case as long as such rules and regulations remain in force.... This rule has been recognized in federal and state jurisdictions and has become known as the '*Accardi* doctrine' since it was announced in *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). There the Supreme Court vacated a deportation order of the Board of Immigration of Appeals because the Board and the Attorney [G]eneral failed to follow their own regulations.' "

*King*, 369 Md. at 282, 799 A.2d at 1250 (quoting *Hopkins v. Md. Inmate Griev. Comm'n*, 40 Md.App. 329, 335, 391 A.2d 1213, 1216–17 (1978). The Court then stated:

"In *Accardi v. Shaughnessy, supra*, 347 U.S. at 268, 74 S.Ct. at 504, 98 L.Ed. at 687, the Supreme Court of the United States held that an administrative decision is subject to invalidation because of the agency's *'failure to exercise* its own discretion[,] contrary to existing valid regulations.' (Emphasis in original). Subsequently in a series of cases, the Supreme Court, relying on the *Accardi* case, has recognized a rule of federal administrative law that, with some exceptions, an administrative agency is required to follow its own procedures or regulations. *See, e.g., United States v. Caceres*, 440 U.S. 741, 751 n. 14, 99 S.Ct. 1465, 1471 n. 14, 59 L.Ed.2d 733, 743 n. 4 (1979) (while a violation of agency regulations did not raise constitutional questions under the circumstances, '[i]t does not necessarily follow, however, as a matter of either logic or law, that the agency had no duty to obey them'); *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270, 294 (1974) ('Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required'); *Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403, 1410 (1957) ('[R]egulations validly prescribed by a government administrator are binding upon him as well as the citizen, and ... this principle holds even when the administrative action under review is discretionary in nature'). *But, cf. American*

*Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 538–539, 90 S.Ct. 1288, 1292–1293, 25 L.Ed.2d 547, 552–553 (1970).[13]

"The Court of Special Appeals has recognized or applied the *Accardi* doctrine in numerous opinions. *See, e.g., Anastasi v. Montgomery County*, 123 Md.App. 472, 491, 719 A.2d 980, 990 (1998); *G & M Ross v. Bd. of License Commissioners*, 111 Md.App. 540, 543, 682 A.2d 1190, 1192 (1996); *Board of School Commissioners v. James*, 96 Md.App. 401, 421–422, 625 A.2d 361, 366–367 *cert. denied*, 332 Md. 382, 631 A.2d 452 (1993); *Board of Education of Baltimore Co. v. Ballard*, 67 Md.App. 235, 239–243, 507 A.2d 192, 194–196 (1986); *Board of Education v. Barbano*, 45 Md.App. 27, 41–42, 411 A.2d 124, 131–132 (1980); *Hopkins v. Maryland Inmate Grievance Commission*, 40 Md.App. 329, 335–338, 391 A.2d 1213, 1216–1217 (1978). *The Court of Special Appeals has taken the position that, in situations where the Accardi doctrine is applicable, it does not matter whether one was prejudiced by the failure of the agency to follow its procedures or regulations. See, e.g., Board of Education of Baltimore Co. v. Ballard, supra,* 67 Md.App. at 239 n. 2, 507 A.2d at 194 n. 2.

"Although this Court has not previously discussed the *Accardi* doctrine as such, or even cited *Accardi v. Shaughnessy, supra,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681, it is clear that, at least to some extent, a similar doctrine is

---

**13.** As we indicated *supra,* where internal regulations are enacted merely to facilitate administrative internal agency policies and are not necessary to afford significant procedural protections, strict compliance with the agency's policies is not required, *i.e.,* the exception to the *Accardi* doctrine. In *American Farm Lines,* the Supreme Court held that the Interstate Commerce Commission's failure "to require strict compliance with its own rules" did not render void its order granting a motor carrier's application for temporary authority to provide carrier service, concluding that substantial compliance existed and that the absence of strict compliance *"did not prejudice "* other carriers who objected to the application. *American Farm Lines,* 397 U.S. at 537–38, 90 S.Ct. at 1291–92, 25 L.Ed.2d at 552 (emphasis added). We shall discuss *infra,* in more detail those cases discussing the exception to the *Accardi* doctrine and what they indicate for the scope of the *Accardi* doctrine as we now adopt it for Maryland courts.

reflected in Maryland administrative law. Thus, the judicial review section of the Maryland Administrative Procedure Act provides that a reviewing court may 'reverse or modify the [administrative] decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision ... (iii) results from an unlawful procedure [or] (iv) is affected by any other error of law....' Code (1984, 1999 Repl.Vol.), § 10–222(h)(iii) and (iv) of the State Government Article.[14]

"Moreover, numerous opinions of this Court have involved the review of agency action to determine if the agency complied with its regulations and required procedures. *See, e.g., Board of Physician v. Levitsky,* 353 Md. 188, 206–207, 725 A.2d 1027, 1036–1037 (1999) (An agency's violations of procedures which do not 'compromise the accused's opportunity for a full and fair hearing on the charges,' or which were not raised during the administrative proceedings, furnish no basis to invalidate the agency's decision); *Dept. of Public Safety and Correctional Services v. Howard,* 339 Md. 357, 369–370, 663 A.2d 74, 80 (1995) (The failure of an agency to complete an investigation within the time set forth in a regulation did 'not reflect any prejudice ... that was caused by the delay,' and therefore the administrative decision was affirmed); *Ward v. Dept. of Public Safety,* 339 Md. 343, 353, 663 A.2d 66, 71 (1995) (Where the suspension of an employee was not authorized by the agency's regulation, the suspension was vacated); *Heft v. Md. Racing Commission,* 323 Md. 257, 265, 592 A.2d 1110, 1114 (1991); *Resetar v. State Board of Education,* 284 Md. 537, 550, 399 A.2d 225, 232, *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979). In addition, we have recognized that, under some circumstances, mandamus or other traditional actions may lie to enforce administrative compliance with procedural requirements or duties. *Gisriel v. Ocean City Bd. of Sup'rs Elections,* 345 Md. 477, 496–500, 693 A.2d 757, 767–769 (1997), *cert. denied,* 522 U.S. 1053, 118 S.Ct. 702,

---

14. *See supra* footnote 3.

139 L.Ed.2d 645 (1998), and cases there cited; *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford,* 307 Md. 1, 17, 511 A.2d 1079 (1986)."

*Id.* at 284–87, 799 A.2d at 1252–53 (one alteration added) (emphasis added).

### c. The Various Applications of the *Accardi* doctrine.

As was noted in *King* and as we indicated *supra,* the *Accardi* doctrine has been applied in many different situations. The actual holding in *Accardi* was somewhat limited and our research reflects that there are two basic interpretations of the *Accardi* doctrine. On the one hand, there is a body of case law subsequent to *Accardi* which has held that an agency's failure to comply with its own rules always automatically nullifies its action where the regulation is promulgated to affect fundamental rights derived from the Constitution or a federal statute.

On the other hand, there is a body of case law which has held the *Accardi* doctrine applicable to a wider variety of administrative regulations, *i.e.,* regulations including and regulations beyond those promulgated to protect fundamental rights derived from the Constitution or a federal statute. This line of cases proposes a more general, more encompassing rule implicating the doctrine, thereby extending the scope of *Accardi.* In such cases some courts have held that violations of agency regulations generally are still *per se* violations of *Accardi.* However, most importantly, in this body of case law a large number of cases have held that when *Accardi* is implicated, and the *Accardi* exception does not apply, the agency decision may, even then, be overturned upon a showing of substantial prejudice on the part of the complainant as a result of the agency's violation of its procedure.

As we have indicated, there are also cases subsequent to *Accardi* that involved "less fundamental" agency created rights and out of these cases, beginning with *American Farm Lines,* the general exception to *Accardi* has been formed. This exception, as we indicated *supra,* proposes that when

purely internal agency procedures are departed from, there is no *per se* requirement that the agency action subsequently be set aside. Generally, the whole of the body of case law discussing *Accardi* supports that even when a "lesser" agency regulation is violated, the agency action can nonetheless be subject to invalidation if the complainant can show substantial prejudice as a result of the agency action.

Subsequent to *Accardi,* in *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), the Supreme Court applied the *Accardi* doctrine to vacate the discharge of a Foreign Service Officer because the Secretary of State had not followed the Department of State regulations gratuitously limiting the Secretary's review of State Department employment termination decisions to those that were adverse to an employee. The Secretary had reversed a decision favorable to John Service, whereupon Service challenged the Secretary's action on the grounds that it violated the Secretary's regulation. The Supreme Court stated that "[R]egulations validly prescribed by a government administrator are binding upon him as well as the citizen, and ... this principle holds even when the administrative action under review is discretionary in nature." *Service,* 354 U.S. at 372, 77 S.Ct. at 1157, 1 L.Ed.2d at 1410. The Supreme Court acknowledged that the Secretary of State was not obligated to adopt "rigorous substantive and procedural standards ... [but] having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them." *Id.* at 388, 77 S.Ct. at 1165, 1 L.Ed.2d at 1418 (alteration added). It appears that in *Service,* the Supreme Court held that an agency's failure to afford an individual safeguard required under its own gratuitous procedural regulations governing employee dismissals may result in the invalidation of the administrative determination, *even if* the regulation is not constitutionally mandated or when regulations are more generous than a statute requires. But, it should be noted, that the prejudice in *Service* was clear.

In *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), the Supreme Court reinstated an employee of the Department of Interior, who had been discharged without

receiving prescribed procedural safeguards, even though the agency could have dismissed him summarily had it not labeled the dismissal a security discharge. Vitarelli was an employee of the Department of the Interior and held a position not designated as "sensitive." He had no protected Civil Service status, and therefore could have been discharged summarily without cause. Purporting to proceed under the Act of August 26, 1950, Executive Order No. 10450 and departmental regulations prescribing the procedure to be followed in "security risk" cases, the Secretary of the Department of the Interior suspended Vitarelli and served him with written charges that due to his "sympathetic association" with Communists or Communist sympathizers, and other similar alleged activities, his continued employment might be "contrary to the best interests of national security." At a subsequent hearing before a security hearing board, no evidence was adduced in support of these charges on the grounds of him being a security risk and no witness testified against Vitarelli. However, Vitarelli himself and four witnesses who testified for him were subjected to an extensive cross-examination which went far beyond the activities specified in the charges.

Subsequently, Vitarelli was sent a notice of dismissal stating that it was "in the interest of national security" and for the reasons set forth in the charges. In 1956, he filed a complaint for a Declaratory Judgment alleging that his discharge was illegal and requested an injunction directing his reinstatement. While the case was pending, a copy of a "Notification of Personnel Action," dated September 21, 1954, stating that it was "a revision of and replaces the original bearing the same date," was filed in the court and a copy was delivered to Vitarelli. This notification was identical with one issued September 21, 1954, except that it omitted any reference to the reason for Vitarelli's discharge, i.e., security reasons, and to the authority under which it was carried out. The Supreme Court held that having chosen to proceed against Vitarelli on security grounds, the Secretary was bound by the regulations which he had promulgated for dealing with such cases, even though Vitarelli could have been discharged summarily and

without cause independently of those regulations. Moreover, the Court mentioned that the record reflected that the proceedings leading to Vitarelli's dismissal from Government service on grounds of national security violated his procedural rights "in at least three material respects" under the applicable departmental regulations. *Id.* at 540, 79 S.Ct. at 973, 3 L.Ed.2d at 1017. First, the statement of charges served upon Vitarelli was vague and not specific and detailed. Second, the regulations required that hearings before security hearing boards be "orderly" and that "reasonable restrictions shall be imposed as to relevancy, competency, and materiality of matters considered." In Vitarelli's hearing this was not so, because as his hearing proceeded it developed into a wide-ranging inquisition delving into this his educational, social, political and religious beliefs. Third, the regulations gave the employee the right to cross-examine any witnesses offered in support of the charges, but at his hearing Vitarelli was questioned at length concerning information supplied by an informant who was not called to testify and thus not subject to cross-examination by Vitarelli. It was argued that Vitarelli's fundamental constitutional rights were violated.

In *Montilla v. Immigration and Naturalization Service,* 926 F.2d 162 (2nd Cir.1991), the case petitioner heavily relies upon, the United States Court of Appeals for the Second Circuit discussed *Accardi* in a case involving a resident alien who appealed an immigration judge's decision to deport him pursuant to the Immigration and Nationality Act of 1952. It involved a failure by the agency to follow its regulations in respect to a fundamental constitutional right—the right to counsel. Specifically, Mr. Montilla claimed that the immigration judge committed reversible error when he failed to follow the INS regulations regarding an alien's right to counsel in deportation proceedings. Mr. Montilla claimed that the judge failed to comply with 8 C.F.R. 242.16(a) because Mr. Montilla's response to the judge's inquiry into whether he wanted to have counsel present at the hearing demonstrated his complete ignorance of the nature of the privilege available to him and the record reflected that Mr. Montilla never "faced and

decided" the question. The regulation required the judge to ensure that Mr. Montilla answered and understood the question. Ultimately, the court held that Mr. Montilla did not knowingly and voluntarily waive his right to counsel.

The Second Circuit, after reviewing *Accardi*, adopted a strict application of *Accardi* and held that where the fundamental rights or interests of the objecting party are involved, any violation of agency regulations is a *per se* violation of the doctrine. In so holding the Second Circuit reasoned:

> "As a practical matter, to remand for agency compliance with its own rules would actively encourage such compliance. Careless observance by an agency of its own administrative processes weakens its effectiveness in the eyes of the public because it exposes the possibility of favoritism and of inconsistent application of the law."

*Montilla*, 926 F.2d at 169 (citing *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)). That Court went on to hold that "For these reasons, we hold that an alien claiming the INS has failed to adhere to its own regulations regarding the right to counsel in a deportation hearing.... All that need be shown is that the subject regulations were for the alien's benefit and that the INS failed to adhere to them." *Id.* at 169. In other words, this holding of the Second Circuit reflects a finding of *per se* reversible error, even in the absence of proof of prejudice, when the agency rule in question affects individual fundamental and constitutional rights.[15]

In *United States v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969), the United States Court of Appeals for the Fourth

---

**15.** We note that even the Second Circuit went on in its subsequent case of *Waldron v. Immigration and Naturalization Service*, 17 F.3d 511, 518 (2nd Cir.1994), and recognized that "where an INS regulation does *not affect fundamental rights derived from the Constitution or a federal statute*, we believe it is best to invalidate a challenged proceeding *only upon a showing of prejudice* to the rights sought to be protected by the subject regulation." (emphasis added). In *Waldron* the Second Circuit appears to have recognized the exception to the *Accardi* doctrine for an agency "regulation which relates to less fundamental, agency-created rights and privileges ... where no prejudice has been shown." *Id.* at 518.

Circuit citing *Accardi,* said "[a]n agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down." The Fourth Circuit went on to hold that "Nor does it matter that these IRS instructions ... were not promulgated in something formally labeled a 'Regulation' or adopted with strict regard to the Administrative Procedure Act; the *Accardi* doctrine has a broader sweep." *Id.* at 812.

In *Heffner,* Internal Revenue Service (IRS) special agents failed to follow their own procedures regarding the interrogation of taxpayers suspected of criminal tax fraud. On October 3, 1967, the IRS voluntarily issued instructions to all Special Agents of the Intelligence Division and those instructions were reported in "IRS News Release No. 897, Oct. 3, 1967." With these instructions, the Fourth Circuit noted, the IRS took upon itself the obligation to give taxpayers, before interrogation, notice that they were suspected of criminal tax fraud and imposed the further obligation to give full Miranda warnings before seeking incriminating statements. Thus the regulations were designed to protect individuals' fundamental rights to be made aware of the nature of the charges against them and to be sure that individuals were apprised of their rights to be represented by counsel, their right to remain silent, etc., all fundamental rights. The defendant's interview occurred almost two months after these instructions had been announced, yet, twice, the Special Agent failed to comply with them during the investigation. First, the Special Agent never warned the defendant that "as a special agent, I have the function of investigating the possibility of criminal tax fraud. Second, the defendant was never advised that he could 'retain counsel.' " *Id.* at 811.

Some states have specifically addressed *Accardi* at length. In *Dugan v. Delaware Harness Racing Commission,* 752 A.2d 529, 531 (Del.2000), the Supreme Court of Delaware, when discussing a Harness Racing Commission rule stated that:

"We assume that the Commission was not required by either the United States Constitution or by statute to adopt

a *prima facie* rule of evidence that was conditioned on establishing certain other procedures. Nevertheless, the United States Supreme Court has held that once an agency does adopt such regulations, 'it does not necessarily follow ... that the agency has no duty to obey them. "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." ' If an agency rule is designed 'to afford ... due process of law by providing safeguards against essentially unfair procedures,' the action which results from the violation of that rule is invalid." [Footnotes omitted.]

It is this strict interpretation of *Accardi* that has been adopted and applied by the Court of Special Appeals in its cases to date. As we have indicated, the Court of Special Appeals has held that when a regulation "affects individual rights and obligations," or confers "important procedural benefits upon individuals," then *Accardi* is applicable and there is a *per se* violation when an agency fails to adhere to such regulations. As well, the Court of Special Appeals has held that prejudice, where *Accardi* is applicable and its exception is not, need not be shown. *See Board of Educ. of Balt. Co. v. Ballard,* 67 Md.App. 235, 239 n. 2, 507 A.2d 192, 194 n. 2 (1986). We shall modify this position.

### Cases Applying *Accardi* and Requiring Prejudice

 From the sampling of the Court of Special Appeals cases, and other cases discussed above, it appears that, under the reasoning of those cases, an agency's failure to comply with its own rules, especially where those rules affect fundamental rights guaranteed by the Constitution or a statute, might mandate invalidation of the agency action by the courts under a *per se* rule. We hold for Maryland that such an interpretation of *Accardi* under those circumstances is too strict and too general. Other jurisdictions have chosen to apply *Accardi* in a less inclusive manner to administrative regulations similar to the way we have interpreted our own APA provisions and our general rule in those cases in which the APA is not applicable. In other cases some jurisdictions

have further chosen to require that, in any event, claimants must demonstrate prejudice resulting from the violation to have the agency action invalidated. We hold that this rationale reflects a more widely accepted interpretation of *Accardi* and is more in line with cases arising from the Supreme Court, and elsewhere, since *Accardi*. More important it is in line with Maryland public policy concerns as expressed by the Legislature in the APA for agencies that come under the APA's aegis.

In *United States v. Caceres*, 440 U.S. 741, 751 n. 14, 99 S.Ct. 1465, 1471 n. 14, 59 L.Ed.2d 733, 743 n. 14 (1979), the Supreme Court held that while a violation of agency regulations did not raise constitutional questions under the circumstances of that criminal case, "[i]t does not necessarily follow, however, as a matter of either logic or law, that the agency had no duty to obey them." In that case, the Supreme Court granted certiorari to decide whether evidence obtained in violation of the IRS regulations may be admitted at the criminal trial of a taxpayer accused of bribing an IRS agent. Specifically, Caceres moved to suppress the tape recordings because all of the authorizations required by the detailed IRS regulations had not been secured. Approval by as many as three different levels of authority pursuant to the IRS regulations might have been required depending upon the type of surveillance. The Government successfully argued that "suppression is especially inappropriate because the violation of the regulation was neither deliberate nor prejudicial, and did not affect any constitutional or statutory rights." *Id.* at 743–44, 99 S.Ct. at 1467, 59 L.Ed.2d at 738.

In *Marshall v. Lansing*, 839 F.2d 933 (3rd Cir.1988), the Third Circuit stated that "a court can set aside agency action which fails to comply with the agency's own regulations, at least where the regulations are designed to protect the individual grievant," implying that a court has some discretion regarding what to do in the context of an agency violation. *Id.* at 943. However, in that same opinion, the Third Circuit went on to cite *Accardi* for the proposition that a "writ of habeas corpus will issue where [a] federal agency fails to

comply with its own regulations," implying that a remand is mandatory where an agency violates its own regulations. *Id.* (citing *Accardi, supra* ). Yet, very recently in *Moi Chong v. District Director, INS,* 264 F.3d 378, 389 (3rd Cir.2001), the Third Circuit seemed to adopt the requirement that claimants demonstrate prejudice and stated that "to warrant reversal, the [regulation] violation *must have prejudiced* Chong." (alteration added) (emphasis added).

*Heffner, supra,* which seemingly adopted the *per se* rule for invalidating an agency action when an agency does not "scrupulously observe" *any* of its rules, regulations or procedures, was recently discussed by the Fourth Circuit in *United States v. Morgan,* 193 F.3d 252 (4th Cir.1999). In that case, that Court emphasized that an agency's failure to afford an individual procedural safeguards required under its own regulations may result in the invalidation of the ultimate administrative determination. *See e.g., Delgado–Corea v. INS,* 804 F.2d 261 (4th Cir.1986). However, in *Morgan,* the Fourth Circuit noted that although the Accardi doctrine originally contemplated that an agency's failure to comply with its own rules would automatically nullify its action, referring to *Heffner,* the Supreme Court has since required that claimants demonstrate prejudice resulting from the violation unless "the rules were not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion" or unless "an agency required by rule to exercise independent discretion has failed to do so." *Morgan,* 193 F.3d at 267 (quoting *American Farm Lines,* 397 U.S. at 538–39, 90 S.Ct. at 1292, 25 L.Ed.2d at 553 (1970)).

In *Martinez–Camargo v. Immigration and Naturalization Service,* 282 F.3d 487, 491 (7th Cir.2002), the Seventh Circuit, in discussing whether the regulatory violation at issue in that case caused prejudice, stated how requiring such a showing when the regulation involved does not affect a fundamental right of the Constitution, "strikes the proper balance between recognizing the need for administrative agencies to follow their own rules with the practical reality that not every agency violation impacts an [individual's] substantive rights."

The Court of Appeals for the Ninth Circuit, relying on *American Farm Lines,* has held that the. INS's failure to follow its own regulations would not invalidate a deportation proceeding unless (1) "the regulation serves a purpose of benefit to the alien," and (2) *"the violation prejudiced interests of the alien which were protected by the regulation."* *United States v. Calderon–Medina,* 591 F.2d 529, 531 (9th Cir.1979) (emphasis added).

In *Steenholdt v. Federal Aviation Administration,* 314 F.3d 633 (D.C.Cir.2003), the United States Court of Appeals for the District of Columbia Circuit, held that the Court lacked authority to review the federal agency's decision not to renew an inspector's qualification to perform inspections of aircraft and, further, specifically discussing prejudice, held that the inspector was not prejudiced by the agency's alleged failure to follow its own gratuitous rules. That Court stated:

"In addition to arguing that the FAA erred in the substance of its decision, a subject over which we have no jurisdiction, Petitioner additionally asserts that the FAA failed to follow its own procedures—specifically, the procedures set out for the renewal of designations in FAA Order 8130.24. In support of our jurisdiction to review this claim, Petitioner relies upon *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). The *Accardi* doctrine requires federal agencies to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions. 'Courts, of course, have long required agencies to abide by internal, procedural regulations ... even when those regulations provide more protection than the Constitution or relevant civil service laws.' *Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1098 (D.C.Cir.1985) (referring to employment regulations); *see also American Farm Lines v. Black Ball Freight Serv.,* 397 U.S. 532, 539, 90 S.Ct. 1288, 25 L.Ed.2d 547, (1970). However, Petitioner's allegation of procedural error avails him nothing. Insofar as Petitioner demonstrates any viola-

tion of the procedures in Order 8130.24, *such violations are without prejudice,* let alone substantial prejudice."

*Id.* at 639 (emphasis added).

In *Von Kahl v. Brennan,* 855 F.Supp. 1413, 1421 (M.D.Pa. 1994), the United States District Court for the Middle District of Pennsylvania explored the *Accardi* doctrine and stated:

"In this case, the regulations at issue clearly are designed to protect an inmate's fundamental due process rights. However, because of the exigencies of the prison disciplinary context, this court is not persuaded that a disciplinary sanction must automatically be vacated and remanded because a particular regulation was violated. Rather, at least in situations where the minimal requirements of due process have been met, *an inmate must show prejudice to the rights sought to be protected by the regulation claimed to be violated.*" [Emphasis added.]

In *In re Application of Jantzen,* 245 Neb. 81, 92, 511 N.W.2d 504, 513 (1994), the Supreme Court of Nebraska noted that "Agency violations of regulations which have been promulgated to benefit a party, by entitling the party to a substantive benefit or exemption or to a procedural safeguard, have been invalidated by courts." However, that court then went on to state that "Many courts will review a waived rule or regulation *only upon a showing of substantial prejudice* to the complaining party." *Id.* (emphasis added).

In *In re Waterfront Development Permit No. WD88–0443–1,* 244 N.J.Super. 426, 582 A.2d 1018 (1990), the Superior Court of New Jersey discussed *Accardi* in a case involving violations of the rules of the Department of Environmental Protection (DEP) by the Commissioner of the DEP. There, that court reversed the issuance of a permit for development by the Commission because the DEP's rules required that the Division of Coastal Resources issue such permits. That court stated:

"The principle was summarized . . . in the following way:

'When an Administrative Agency promulgates rules to govern its proceedings, these rules must be scrupulously

observed. This is so even when the defined procedures are "generous beyond the requirements that bind such agency." For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate those rules. If an agency in its proceedings violates its rules *and prejudice results,* any action taken as a result of the proceedings cannot stand.' "

*In re Waterfront,* 244 N.J.Super. at 434, 582 A.2d at 1021 (citations omitted) (emphasis added).

In *Henry v. Corporation Commission of the State Oklahoma,* 825 P.2d 1262 (Oak.1990), the Supreme Court of Oklahoma discussed *Accardi* in a case involving the appeal of a decision of the Corporation's Commission of the state which permitted certain gas utilities to invoke a general rate increase. The Supreme Court of Oklahoma held that the Corporation Commission's order directing the rate increase was invalid because Corporation Commission had failed to adhere to its own procedural rule set forth in the Corporation Commission's Rules of Practice. However, that court's decision was based on "prejudice." In *Henry,* 825 P.2d at 1267, that court stated:

"The Oklahoma Corporation Commission is constitutionally empowered with the authority to make rules governing procedure and practice before the Commission. These rules, regulations, and standards adopted by the Commission have the force and effect of the law. When an administrative agency such as the Commission promulgates rules to govern its proceeding these rules must be scrupulously observed. Once the agency creates procedural rules it denies itself the right to violate these rules, and an action taken in violation of these procedural rules will be stricken down by the courts. This doctrine was announced in the case of *United States ex rel. Accardi v. Shaughnessy.*

"It is of no significance that the procedural rule here established by the Commission is more generous than that required by the constitution or by statute. The Commission's failure to follow its own procedural rule vitiate such

actions *where prejudice results."* [Footnotes omitted.] [Emphasis added.]

### This Case and *Accardi*

Requiring a showing of prejudice is necessary, especially in cases like the one at bar, where Patuxent was trying to comply with procedures and its staff committed mere technical mistakes in complying with a regulation that applied generally within the institution, and not just specifically to parole revocation or renewal hearings, thus departing in a minimal way from an internal directive relating, not to fundamental rights but to evidentiary matters. The regulatory violations petitioner alleges, were insubstantial and, moreover, resulted in no prejudice to petitioner. The Court of Special Appeals thoroughly addressed petitioner's complaints and properly held that the title, stated purpose, language and history of PID 110–18 indicate that PID 110–18 was intended as a guide to Patuxent in the orderly carrying out of its agency business and was not intended to protect fundamental rights. While we agree with the Court of Special Appeals that PID 110–18 does not "confer important procedural benefits and safeguards" upon individual parolees like petitioner, but rather serves to aid the orderly transaction of Patuxent business, under the rule we adopt here it would have made no difference in the result if it had. Both under the APA (that does not apply in this case) and the version of *Accardi* we now adopt for Maryland, prejudice to the complainant must, generally, be shown. Prejudice is a key. There was an insufficient showing of prejudice in the present case.

■ Although a guard had written the wrong inmate number on the specimen paperwork, petitioner signed it and then wrote his correct inmate number on it. There was additional evidence that was sufficient to establish accurate and unambiguous identification of petitioner's specimen. Specifically, the laboratory results and the specimen itself were unambiguously identified by petitioner's name. Petitioner's name was unlike the name of either of the other six inmates whose specimens were sent for testing on the same day.

 Additionally, there was substantial evidence to support the Board's "chain of custody finding." The use of the incorrect identification number on the form, when that number was listed on the document line directly above where petitioner affixed his signature to verify that he had given that particular specimen and hand wrote in his correct inmate number next to his signature, vitiates against a conclusion that he was prejudiced. In fact, as the Court of Special Appeals opined, there was little possibility of confusion of petitioner's specimen from the failure to maintain a technically proper chain of custody due to the fact that petitioner's name was unlike the others, petitioner signed his name under the incorrect number and wrote in, himself, his correct inmate number, and the testing company used only one number to test and attribute the specimen to petitioner. The evidence was sufficient to support the Board's finding that the positive specimen, while the paperwork was both incorrectly and correctly numbered, was petitioner's specimen, and that the chain of custody was never broken.

Petitioner also claims that PID 110–18 was violated because PID 110–18 requires that the officer taking custody of the urine specimen "secure a piece of Evidence Tape over the cap." The clear purpose of the evidence tape procedure is to secure the specimen from tampering. In the case *sub judice,* petitioner himself secured the evidence tape over his own sample. Thus, even though the officer did not technically comply with PID 110–18, *i.e.* affix the tape himself, petitioner did. The procedure that required that the tape be affixed was still followed, albeit that petitioner sealed his own sample. It was sealed with tape, and thus protected, by petitioner. No prejudice resulted.

We hold that the record reflects that there is sufficient evidence in the administrative record to support the Board's finding that the positive urine specimen was petitioner's specimen and because we hold that petitioner has not proven that he was prejudiced by Patuxent's staff's technical infractions, the Board's decision is, for the reasons stated herein, affirmed.

### Conclusion

Consistent with our own APA in respect to the agencies to which it applies, we adopt for other administrative agencies, the *Accardi* doctrine as we modify it and hold that an agency of the government generally must observe rules, regulations or procedures which it has established and under certain circumstances when it fails to do so, its actions will be vacated and the matter remanded. This adoption is consistent with Maryland's body of administrative law, which generally holds that an agency should not violate its own rules and regulations.

In so holding we nonetheless note that not every violation of internal procedural policy adopted by an agency will invoke the *Accardi* doctrine. Whether the *Accardi* doctrine applies in a given case is a question of law that, as the Court of Special Appeals has opined, requires the courts to scrutinize the agency rule or regulation at issue to determine if it implicates *Accardi* because it "affects individual rights and obligations" or whether it confers "important procedural benefits" or, conversely, whether *Accardi* is not implicated because the rule or regulation falls within the ambit of the exception which does not require strict agency compliance with internal "procedural rules adopted for the orderly transaction of agency business," *i.e.*, not triggering the *Accardi* doctrine.

Additionally, we adopt the exception to the *Accardi* doctrine which provides that the doctrine does not apply to an agency's departure from purely procedural rules that do not invade fundamental constitutional rights or are not mandated by statute, but are adopted primarily for the orderly transaction of agency business.

To this extent we adopt the application and rationale of the Court of Special Appeals in its previous applications of the *Accardi*. We reject, however, the Court of Special Appeals' holdings where that court has indicated that there can be a *per se* violation of the doctrine in situations where it may be applicable, regardless of whether the complainant involved

was prejudiced by the failure of the agency to follow its procedures or regulations.

Where the *Accardi* doctrine is applicable, we are in accord with the line of cases arising from the Supreme Court and other jurisdictions which have held that prejudice to the complainant is necessary before the courts vacate agency action. In the instances where an agency violates a rule or regulation subject to the *Accardi* doctrine, *i.e.*, even a rule or regulation that "affects individual rights and obligations" or affords "important procedural benefits upon individuals," the complainant nevertheless must still show that prejudice to him or her (or it) resulted from the violation in order for the agency decision to be struck down. In other instances where an exception to *Accardi* applies and where an agency fails to follow its "internal administrative procedures," if the complainant can nonetheless show prejudice to a substantial right due to the violation of the rule or regulation by the agency, then the agency decision may be invalidated pursuant to the Maryland Administrative Procedure Act. In either case, prejudice must be shown.

In summary, we affirm the Court of Special Appeals' holding that PID 110–18, the Patuxent directive violated in the case *sub judice* implicates the *Accardi* doctrine, but also implicates the *Accardi* exception for the reasons stated herein and the reasons indicated in the intermediate appellate court's opinion in the case in this appeal. PID 110–18 merely provides for the orderly transaction of Patuxent business of collecting and handling urine specimens. The provisions at issue here implicate no fundamental constitutional rights and are not imposed on the agency by statute.

Moreover, we reject petitioner's contentions that he suffered prejudice in the way the sample was handled and, by the Board's consideration of the positive urinalysis sample which was submitted by him. He signed the specimen document. He wrote the correct inmate number on it; he affixed the evidence tape on the top of the jar. It was his urine sample. In the instant case, Patuxent staff were generally following

PID 110–18, but committed purely technical infractions, *i.e.,* "dotting the 't's' and crossing the 'i's.' " Petitioner failed to demonstrate prejudice.

**FOR THE REASONS HEREIN STATED THE JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**